WILLIAM LANGER, Respondent, v. THE COURIER-NEWS, a Corporation, William Lemke, George F. McPherson, and Herbert A. Gaston, Appellants.

(179 N. W. 909.)

**Libel and slander — libelous publications defined under statute.**

    1. Under Comp. Laws 1913, § 4352, "any publication, by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation," is libelous.

**Libel and slander — effect of general demurrer as admission in libel action stated.**

2. A general demurrer to a complaint in an action for libel admits allegations of falsity and publication and malice, and the correctness of the innuendo as averred in the complaint, unless the innuendo attributes a meaning to the words which is not justified by the words themselves or by the extrinsic facts with which they are connected.

**Libel and slander — when publications libelous as matter of law stated.**

3. Where a complaint in an action for libel charges that the defendants maliciously published of and concerning the plaintiff a certain false and defamatory statement; that such statement was intended by the defendants to convey to the readers thereof such defamatory meaning, and was so understood by the readers,—the court cannot say that the statement was not libelous, unless it can say as a matter of law that the publication of the article of and concerning the plaintiff did not expose him "to hatred, contempt, ridicule, or obloquy," or "cause him to be shunned or avoided," or have "a tendency to injure him in his occupation."

**Libel and slander — criticism of attorney general not privileged; complaint held to state cause of action in libel.**

4. For reasons stated in the opinion it is *held* that the complaint in this case states a cause of action for libel.

Opinion filed October 21, 1920.

Appeal from the District Court of Cass County, *Cole,* J.

Defendants appeal from an order overruling a demurrer to the complaint.

Affirmed.

*Harry Lashkowitz* and *Vince A. Day,* for appellants.

"A newspaper has the right to fairly and honestly comment on matters of public interest, such as the official conduct of any public officer." Cook v. Pulitzer, 241 Mo. 326, 145 S. W. 481; N. D. Comp. Laws 1913, § 9556; Robertson v. Edelstein (Wis.) 80 N. W. 724; Gundram v. Daily News (Iowa) 156 N. W. 840; Herringer v. Ingberg (Minn.) 97 N. W. 460.

It is for the court to say as a matter of law whether the words are libelous or not libelous. Wood v. Star Publishing Co. 90 Wash. 85, 155 Pac. 400. Shaw, J., in Carter v. Andrews, 16 Pick. 1.

Courts cannot be ignorant in court of what they themselves and all others know out of court. Walsh v. Pulitzer, 250 Mo. 142, 157 S. W.

985; McCue v. Equity Co-op. Pub. Co. 39 N. D. 190, 167 N. W. 225; Newell, Slander & Libel, 2d ed. p. 291, § 5; Black v. State Co. 93 S. C. 467, 77 S. E. 51, Ann. Cas. 1914C, 989.

*W. S. Lauder* and *A. G. Divet,* for respondent.

Even though written or printed matter does not charge crime, and would not, legally speaking, constitute slander if the language used were merely spoken, it is libelous if tending to expose a person to public hatred, contempt, ridicule, aversion, disgrace, or tends to bring a person into obloquy, or reflects upon his character, or lowers him in general public estimation. Townsend, 76, 77 and notes; Newell, 32–35 and notes; St. James Military Academy v. Gazier, 28 L.R.A. 667; Century Dig. 1854, § 1, and numerous cases there cited; Weston v. Grand Rapids Pub. Co. 87 N. W. 258; Bradley v. Gramer, 59 Wis. 309; Whitney v. Janesville Gazette, 5 Bliss. 330, Fed. Cas. No. 17,590; Carey v. Allen, 39 Wis. 481; Montgomery v. Knox, 23 Fla. 595; Bergman v. Jones, 94 N. Y. 51; Hillhouse v. Dunning, 6 Conn. 391; Shattuck v. McArthur, 25 Fed. 133; Huse v. Inter Ocean Pub. Co. 12 Ill. App. 627.

By demurring, defendants admit the allegations of the complaint. 31 Cyc. 333; 6 Enc. Pl. & Pr. 334; 6 Standard Enc. Proc. 943; Englund v. Townley (N. D.) 174 N. W. 755; Martinson v. Froeberg (N. D.) 175 N. W. 618.

The publication of rumors or hearsay or reports is libelous. Waters v. Jones, 29 Am. Dec. 261; Giddens v. Merk, 4 Ga. 364; Nye v. Otis, 8 Mass. 132; Simmons v. Holster, 13 Minn. 249; Bee Pub. Co. v. Shields, 94 N. W. 1029.

It is immaterial what the writer or publisher of the libel meant. It is no defense in a libel case that the defendant did not mean to libel plaintiff. Taylor v. Bearst (Cal.) 40 Pac. 132; McAllister v. Press Co. (Mich.) 43 N. W. 431.

CHRISTIANSON, Ch. J. This is an action for libel. The defendants interposed a demurrer to the complaint on the ground that it did not state a cause of action. The demurrer was overruled, and the defendants have appealed to this court.

The complaint, the sufficiency of which is the sole question here, is as follows:

Comes now the above-named plaintiff, and for his amended complaint herein alleges and shows to the court:

I. That the defendant The Courier-News is a corporation duly created, organized, and existing under the laws of the state of North Dakota, and was such corporation during all the times hereinafter mentioned; that the defendant William Lemke is, and during all the times hereinafter mentioned was, the duly elected, qualified, and acting president of said corporation; that the defendant George F. McPherson is, and during all the times hereinafter mentioned was, the duly elected, qualified, and acting secretary of said corporation; that the defendant Herbert E. Gaston is, and during all the times hereinafter mentioned was, the duly elected, qualified, and acting treasurer and general manager of said corporation.

II. That during the times hereinafter mentioned the defendant The Courier-News was the owner, publisher, and distributor of a certain daily newspaper known, named, and designated as "The Courier-News;" that during the times hereinafter mentioned the said newspaper had a wide circulation among the people in all parts of the state of North Dakota and also among the people residing in the northwestern part of the state of Minnesota and elsewhere; that plaintiff is informed and verily believes, and upon such information and belief alleges, the fact to be that during said times the daily circulation of said newspaper exceeded 10,000 copies; that said newspaper was read daily by many thousands of people residing throughout the state of North Dakota and also by many people residing within the northwestern part of the state of Minnesota and elsewhere; that the defendants Lemke, McPherson, and Gaston, as officers of said corporation and otherwise, were, and each of them was, during the times hereinafter mentioned, actively engaged in the publication of said newspaper, and in composing and securing the publication of the various articles and matters appearing daily in said newspaper; that during said times the said defendants Lemke, McPherson, and Gaston had and exercised general authority and supervision over the publication and circulation of said newspaper, and determined, controlled, and directed its general policy with respect to politic and other issues, and also determined, directed, and controlled its attitude toward particular individuals, and especially toward the

46 N. D.—28.

public officers of the state of North Dakota; and they, and each of them, had knowledge of, and approved of the publication of, the articles hereinafter set forth, and ratified the publication thereof.

III. That during the times hereinafter mentioned the plaintiff was and still is an attorney and counselor at law, duly admitted and licensed to practice as such in all the courts of the state of North Dakota, and was at all said times the duly elected, qualified, and acting attorney general of the state of North Dakota; that plaintiff was elected attorney general of said state at the general election held in the month of November, 1916, and duly qualified and assumed the duties of said office in the month of January, 1917, and ever since said date last aforesaid has been in the active performance of the duties of said office; that prior to the qualification of plaintiff as attorney general, as aforesaid, he was, and for a number of years prior thereto had been, in the active practice of the legal profession, and enjoyed a large and lucrative practice as a lawyer, and was well known in the state of North Dakota as a lawyer, and had a good standing among the people of the state of North Dakota and elsewhere as a practicing lawyer, and was by the people of North Dakota generally held in high esteem as a lawyer, and was generally considered by the people of said state as a lawyer of ability and integrity, which good standing, reputation, and esteem continued undiminished until the time of the publication of the article hereinafter set forth; that since the plaintiff qualified as attorney general and entered upon the duties of said office he has not engaged in the general practice of law, and has not practiced the legal profession at all except in the discharge of his duties at attorney general, as aforesaid; that plaintiff has no other profession or calling except that of attorney and counselor at law, and that on the completion of his service as attorney general as aforesaid plaintiff expects to and will again engage in the general practice of law in the state of North Dakota; that during all said times plaintiff was a man of good character, and was highly esteemed by his fellow citizens generally, and was never guilty of any acts of fraud, corruption, or misconduct, and was never charged or suspected of being guilty of any such acts prior to the publication of the article aforesaid, and that until the publication of the said article the plaintiff was highly esteemed by the people of North Dakota as attorney general of said state, and was generally regarded in his said office as an official of ability and integrity.

IV. That on the 24th day of July, 1919, the defendants wishing, intending, and contriving to injure the plaintiff in his good name and fame among the people of the state of North Dakota and elsewhere, and wishing, intending, and contriving to injure plaintiff in his character and capacity as an attorney and counselor at law and also as attorney general of the state of North Dakota, intentionally, wilfully, maliciously, and unlawfully printed and published, and caused to be printed and published, in said newspaper in all the copies of said issue of said date, of and concerning plaintiff as an indivdual and in his business and profession as a lawyer and in his official character and office as attorney general, a certain false, malicious, defamatory, and libelous article, which said article was and is in the words and figures and of the tenor following, to wit:

"I. V. A. Plan to Initiate 2 New Laws for State

"Farmers' Foes Plan Another Attack on Printing and Administration Acts, It Is Reported.

"If some of the leaders of the Independent Voters' Association have their way, initiative petitions will be circulated for two new laws designated to take the places of the newspaper and administration acts passed by the last legislature and indorsed by the people at the referendum election last month. I. V. A. officers and members have been in session in Fargo for the past three days, discussing the decisive defeat administered to them by the farmers of the state in the referendum campaign, and considered what course the organization is to pursue from now on.

"Only members of the inner circle were admitted to the sessions, and but a few of those present were willing to discuss what took place. It was said, however, that it appeared to be the sentiment of a majority of those who took part in the deliberations that such petitions should be circulated.

"Dissatisfied with Campaign.

"It also leaked out that the sentiment was far from unanimous when it came to approving the manner in which the late campaign was conducted. It became apparent early in the sessions that some of the I. V. A. backers, who had taken the matter of defeating the farmers seriously, and not as a convenient camouflage for maintaining a graft

institution, were in favor of abiding by the decisions of the great majority of the voters and not keep up the fight any longer.

" 'I don't believe in the League program, but it appears that an overwhelming majority of the people of North Dakota do,' said one of those who attended the sessions last evening. 'Since the people have unmistakably, on several occasions, shown that they want this program tried, why, I think it should be tried. This is a land of majority rule, and I think it is time for the people of the state to quit fighting and pull together for the common good.

## "Looks Like Graft to Him.

" 'I did all I could to back the I. V. A., and I believe I was right in so doing under the circumstances. But this plan to initiate two new laws to take the place of those so strongly indorsed by the people seems to me to smack too much of a grafting scheme. The last campaign cost a lot of money. Where it came from and where it went does not seem so very clear to anyone connected with it, at least none has volunteered the information to my knowledge. Coupled with the fact that certain men, connected with the organization display such eagerness to keep up the fight this has aroused my suspicion.'

"Among those present at the gathering were President Iverson of the I. V. A., who resides at Walum, and 'Free-love-Bill' Harris. Some concern was expressed over the absence of Attorney General Langer, according to reports. The organization of the New Economy League at Bismarck some time ago was also the subject of speculation, it seems. It was freely admitted that the encouragement of the new organization would result in a serious split in the ranks of Nonpartisan League opposition.

## "Langer Wants Control.

"It became clear early in the referendum campaign that two factions were seeking control of the I. V. A. One was headed by Attorney General Langer and the other by President Iverson. Langer visited heads of Minneapolis and St. Paul corporations that are financing the I. V. A. early this year, and demanded that he be made custodian of the slush funds that were expected in North Dakota. His record was against him, and those gentlemen turned him down, though politely. Because of

this Langer is sore, it was said yesterday, and is attempting to build up a machine of his own.

"Because of the open deflection in the I. V. A. ranks it was decided to hold up final decision on the initiative movement until it had been ascertained if the Economy League will join in. This matter is to be taken up at a future meeting."

V. That at the times hereinafter mentioned there existed within the state of North Dakota an association of persons organized for political purposes, and known as the "Independent Voters Association," which association was well known among the people of the state of North Dakota; that said association was generally referred to and designated as the "I. V. A.;" that the letters I. V. A. contained in said article referred to, and the persons who received and read said newspaper, understood said letters to refer to and to mean the said Independent Voters' Association. That during all of said times there existed in the state of North Dakota an association organized for political purposes, and known and designated as "The Nonpartisan League," that said Nonpartisan League was at all said times well known in the state of North Dakota and to the people generally in the state of North Dakota, and was generally known as a political association or organization, and was, and for more than two years prior to the publication of said article had been, actively engaged among the people of the state of North Dakota in political work.

That during all the times herein mentioned there was active rivalry between the said Independent Voters' Association and the said Nonpartisan League for the favor and support of the people and voters of the state of North Dakota, each of said societies at all times actively seeking the suffrage of the voters of said state in support of their respective political principles, ideas, and policies and actively engaged in opposition to the political principles, ideas, and policies of the other association.

VI. That among the people of the state of North Dakota generally, and among the people who subscribed for and read the said newspaper, the term "slush funds" means, and was among said people generally understood to mean, funds of money collected by wrongful and unlawful means, and used and to be used to bribe voters, and to wrongfully and unlawfully purchase the influence of newspapers and other pub-

lications, and, generally speaking, to debauch the voters of the state and corrupt elections held in the state, and that in publishing said article the defendants used said term "slush fund" in the sense aforesaid, and intended it to be so understood by those who might read said article; that the persons who read said article understood the said term "slush funds" to mean as above set forth, and in reading said article gave said term such meaning, and believed from reading such article that plaintiff was engaged in collecting a fund of money to be used by him for the purpose above set forth. And in that behalf plaintiff further alleges that in publishing the said article the defendants charged, and intended to charge, that plaintiff visited the heads of corporations in the cities of St. Paul and Minneapolis, in the state of Minnesota, and demanded of them that they, and the corporations which they represented, should contribute to "slush funds," and that said slush funds should be turned over to the plaintiff, to be expended by him in bribing voters in the state of North Dakota at elections to be thereafter held, and to wrongfully purchase the influence of newspapers and other publications in molding public opinion concerning issues pending before the people of the state of North Dakota, and to be used by the plaintiff wrongfully, unlawfully, and corruptly in influencing and directing public opinion, and in debauching the voters of the state, and in corrupting elections to be held in the state, and that said funds should be so used by plaintiff to promote the interests of corporations having their offices in the cities of Minneapolis and St. Paul, and that plaintiff should use said slush funds wrongfully, unlawfully, and corruptly, and against the best interests of the people of the state of North Dakota; that the persons taking and reading said newspaper and reading said article understood said article to charge plaintiff with the doing of the things, and the commission of the acts, and for the purposes and with the intentions hereinbefore set forth.

VII. Plaintiff further alleges that it is not true that he was head of a faction that sought to control the said Independent Voters' Association, and plaintiff further alleges that the statement that "Langer visited heads of Minneapolis and St. Paul corporations that are financing the I. V. A., early this year, and demanded that he be made custodian of the slush funds that were expected in North Dakota," is wholly and absolutely false, and in that behalf plaintiff further alleges

that he never visited with or called upon the heads of or officers of any corporation or other business concern in St. Paul or Minneapolis or elsewhere with reference to the subject of collecting moneys or funds for political purposes, or to be used in connection with any activities of the said Independent Voters' Association or any other organization, and he was never engaged in the attempt or effort, directly or indirectly, to collect or have collected any slush funds or funds of any kind or character, directly or indirectly connected with any political activities or any other purposes whatsoever, and in that behalf he further alleges that he never called upon or visited in the city of St. Paul or Minneapolis any person known to him to be connected with any corporation, except as follows, to wit: He once called upon and visited with G. A. Thiel, secretary of the Equity Co-operative Exchange in St. Paul; he once called upon and visited with R. C. Lilly, president of the Merchants National Bank of St. Paul, Minnesota; and he once called upon and visited J. O. Sylvester, an officer of the Sylvester Land Company, in St. Paul, Minnesota; that none of said visits were in anywise connected with the subject of raising or collecting money for political purposes or at all, but were all connected with and related solely to purely personal matters and matters pertaining to his official position as attorney general, and affecting and concerning the interests of the state of North Dakota, and plaintiff never solicited said parties or any of them to contribute money to any purpose, political or otherwise, or to pay or deliver money to him or to anyone else for any purpose, and the subject-matter of slush funds or the collection of money for any political purpose was never referred to, directly or indirectly, between plaintiff and any of said persons; and plaintiff further alleges that the said article, and the whole thereof, in anywise applying to the plaintiff was and is absolutely false, and that when said article was published as aforesaid neither of said defendants had any reason to believe the statements therein contained referring to plaintiff were true or contained any particle of truth; that said article was published as aforesaid by defendants, and said charges were made against said plaintiff by the said defendants and each of them, wilfully and maliciously, and with the deliberate purpose and intention of injuring plaintiff as a man, as a lawyer, and as a public officer.

VIII. That on the 2d day of September, 1919, the plaintiff, in writ-

ing, demanded of the defendant The Courier-News that it retract the statements and charges contained in said article and referring to plaintiff, and that it publish such retraction but the said defendant, The Courier-News, has refused and still refuses and neglects to retract the said statements and charges, or to publish any real retraction of said statements and charges. And in that behalf plaintiff alleges that, instead of retracting the said charges against plaintiff contained in said article and publish such retraction, the defendants in all the copies of said newspaper of date September 4, 1919, and in aggravation of the charges made against plaintiff in the article hereinbefore referred to, on the editorial page of said newspaper printed and published an article in the words and figures and of the tenor following, to wit:

## "Wherein We Retract Again.

"Now it's Attorney General Langer who is demanding a retraction. Between County Auditor Tucker and Attorney General Langer we are apparently going to be kept so busy writing retractions that we shall have time for nothing else. But we are nothing if not obliging, and so, if the attorney general wants a retraction, here goes:

"It seems the more or less Honorable Attorney General is peeved because of a story that appeared in our columns not long since concerning the internal disséntions of the I. V. A. In that story appeared these sentences:

" 'Langer visited heads of Minneapolis and St. Paul corporations that are financing the I. V. A., early this year, and demanded that he be made custodian of the slush funds that were expected in North Dakota. His record was against him, and these gentlemen turned him down, though politely. Because of this Langer is sore, it was said yesterday, and is attempting to build up a machine of his own.'

"The Honorable Attorney General did not specify what in these sentences he considered libelous. It was probably not the alleged fact of his meeting with certain Twin City corporation heads. That meeting, we believe, was commented upon at the time by the Twin Cities' big business press, and inasmuch as we have no knowledge that Mr. Langer has begun suit against them he doubtless concedes the fact of the meeting.

"We take it, then, that what we are asked to retract is the charge

that he asked to be made custodian of the slush funds. Or is it that he was refused? Either way, we'll have to retract. That statement was merely an assumption on our part. The reporter who wrote those sentences was not sufficiently acquainted with Mr. Langer's impeccable character. He was proceeding on the assumption that Mr. Langer is actuated by the same motives as other politicians, which, of course, isn't true.

"If the average politician, after being elected, pledged to support a certain program, and then, having turned traitor to that program, had met with the financial props of the opposition, it would have followed, as night and day, that he had been seeking support, financial or otherwise, for the furthering of his own ambitions.

"But, of course, in Mr. Langer's case, it is all different. He is a traitor to his pledges, it is true, but he is actuated by no base or mercenary motives. He is simply engaged in saving his beloved state from 'red socialism.' His visit to the Twin Cities' financiers, coinciding as it did with his betrayal of the cause of the farmers who elected him, was purely a coincidence. He went to the Twin Cities merely to talk of the weather. And under no circumstances, of course, would he accept office, or any assistance towards office, from those big business interests. He is utterly unselfish, entirely unmercenary, actuated, we cannot too often repeat, only by the very highest degree of high motives.

"We want to do full justice to Mr. Langer's irreproachable character. We want no blot to dim his fair name. We regret exceedingly that any charge against him, of mercenary motives or personal ambition, ever entered our columns. He should stand forth, a traitor, in the good old French phrase, *sans peur et sans reproche*. He betrayed the farmers who elected him, not for any selfish advantage, but for their own good. We are only too happy to make this abject retraction, and to clear from all obloquy a name that will stand forth in all future history of North Dakota so unapproached as that of William Langer."

That both of said articles were printed, published, and circulated of and concerned plaintiff by the said defendants wilfully, unlawfully, and maliciously, and with the intention and for the purpose of injuring plaintiff in his good name and fame as a man, a lawyer, and a public official.

That the article first hereinbefore referred to and set forth, so far as

the same referred to or applied to plaintiff, was and is false and defamatory, that by means thereof the plaintiff was greatly injured in his standing and reputation among the people of the state of North Dakota and elsewhere, and his good name and credit as a man, a lawyer, and public official was greatly damaged and injured, and that by reason of all the premises plaintiff has been damaged in the sum of fifty thousand ($50,000) dollars, no part of which has been paid.

Wherefore, plaintiff prays judgment against the defendants for the sum of fifty thousand ($50,000) dollars, and legal interest thereon from the 24th day of July, 1919, together with his costs and disbursements of this action.

A demurrer admits allegations of falsity, publication, and malice, and the correctness of the innuendo as averred in the complaint, unless the innuendo attributes a meaning to the words which is not justified by the words themselves or by the extrinsic facts with which they are connected. McCue v. Equity Co-op. Pub. Co. 39 N. D. 190, 167 N. W. 228; Meyerle v. Pioneer Pub. Co. 45 N. D. 568, 178 N. W. 792; 25 Cyc. 468; 17 R. C. L. 398.

"Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Comp. Laws 1913, § 4352.

"A privileged communication is one made:

"(1) In the proper discharge of an official duty.

"(2) In any legislative or judicial proceeding, or in any other proceeding authorized by law.

"(3) In a communication without malice to person interested therein by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information.

"(4) By a fair and true report without malice of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof.

"In the cases provided for in the subdivisions 3 and 4 of this section,

malice is not inferred from the communication or publication." Comp. Laws 1913, § 4354.

If the language contained in the publication fairly imputes to the plaintiff such acts of conduct as would naturally result in exposing the plaintiff to hatred, contempt, ridicule, or obloquy, or cause him to be shunned or avoided, or had a tendency to injure him in his occupation, it would be libelous *per se.* Lauder v. Jones, 13 N. D. 525, 541, 101 N. W. 907; Meyerle v. Pioneer Pub. Co. supra.

In this case, the plaintiff has not merely averred that a certain statement, alleged to be false and defamatory, has been published of and concerning him; he has gone further, and by specific averments set out the surrounding circumstances; that the language published referred to plaintiff, and was intended to and did, convey to the readers thereof a certain defamatory meaning, and that by reason thereof plaintiff sustained certain special damages.

"This being so, the complaint is not demurrable unless the court can say as a matter of law that the publication of the newspaper article in question of and concerning plaintiff did not expose him "to hatred, contempt, ridicule, or obloquy," and could not have caused him "to be shunned or avoided," or had "a tendency to injure him in his occupation." Comp. Laws, § 4352. If reasonable men, in the exercise of their judgment and reason, might differ as to whether the publication of the article had such effect, then it is for the jury to determine what the fact is. 25 Cyc. 542; 13 Enc. Pl. & Pr. 106; Newell, Slander & Libel, pp. 281, 290, 291. "If there is any doubt as to the meaning of a publication claimed to be libelous, so that extrinsic evidence is needed to determine its character as to its being actionable, it is a question for the jury, under proper instructions from the court, to find its true character and significance." Newell, Slander & Libel, 2d ed. p. 290, § 3. And where the words of an alleged libelous publication "are reasonably susceptible of two constructions, the one innocent and other libelous, then it is a question for the jury which construction is the proper one." In such a case if the defendant demurs to the declaration his demurrer will be overruled. Or, in other words, the rule may be stated thus: It is for the court to decide whether a publication is capable of the meaning ascribed to it by an innuendo, and for the jury to determine whether such meaning is truly ascribed. Newell, Slander &

Libel, 2d ed. p. 291, § 5.   See also Black v. State Co. 93 S. C. 467, 77
S. E. 51, Ann. Cas. 1914C, 989; McCue v. Equity Co-op. Pub. Co.
supra.

The first article charged that the plaintiff "visited heads of Minneap-
olis and St. Paul corporations that are financing the I. V. A., early this
year, and demanded that he be made custodian of the slush funds that
were expected in North Dakota." It further charges: "His record
was against him, and these gentlemen turned him down, though polite-
ly." The language quoted assumes that certain "slush funds" were ex-
pected in North Dakota, and charges that the plaintiff "demanded that
he be made custodian of the slush fund;" but that his record was such
that the contributors to the slush funds refused to comply with his de-
mands.

The second article admits that the *charge* contained in the first arti-
cle, that the plaintiff demanded that he be made custodian of slush
funds, and that such request was refused, was "merely an assumption"
on the part of the reporter who wrote the article. The remainder of
the article speaks for itself. It seems to be in effect an ironical reaffirma-
tion of the charge made in the first article.

"It is well settled that a publication imputing roguery, rascality, or
general depravity, which carries with it a charge of moral turpitude and
degradation of character, the natural tendency of which is to hold the
party up to hatred, contempt, or ridicule, and to expose him to the repro-
bation of virtuous and honorable persons, is libelous. 25 Cyc. 260; 17
R. C. L. pp. 290, 291. McCue v. Co-op. Pub. Co. supra. A libelous
charge may be made indirectly as well as directly. 17 R. C. L. p. 314;
18 Am. & Eng. Enc. Law, p. 977.

In Cooper v. Greeley, 1 Denio, 347, the plaintiff had announced
through the press that he intended to sue the publishers of the New York
Tribune for libel. In commenting on this announcement, Mr. Greeley,
in the columns of his paper, said:

"There is one comfort to sustain us in this terrible dispensation. Mr.
Cooper will have to bring his action to trial somewhere. He will not
like to bring it in New York, for we are known here, nor in Otsego
county; *for he is known there."*

Cooper brought action, alleging that this statement was libelous, and
by innuendo, averred the meaning of the last clause to be that the plain-

tiff Cooper, in consequence of being known in the county of Otsego, was in bad repute there, and would not, for that reason, like to bring a suit for libel in that county. Defendant's counsel (W. H. Seward) contended that the charge was not libelous. In his argument he said: "The words set forth do not constitute a libel. The charge that the plaintiff did not, for any cause, like to bring action for libel to trial in Otsego county is not defamatory or libelous. It only reiterates and applies to the plaintiff the truism that 'a prophet has no honor in his own country.' The point of the article is the inference that the plaintiff would prefer a trial where the prejudice and rivalries which assail every man at home should not reach him." The court, however, overruled this contention, and held that the publication amounted to a charge that the plaintiff was in bad repute in the county referred to, and for that reason would not like to bring the issue to trial in that county, and that as so understood the publication exposed the plaintiff to contempt and ridicule, and, hence, was libelous.

It is suggested by appellants' counsel that the publications were privileged. Its privileged character certainly does not appear from anything said in the complaint. Clearly the publications do not fall within privileged communications as defined by our statute. See § 4354, supra. The statement does not purport to be a comment upon, or criticism of, any official act of the plaintiff. The second statement admits that the first charge was made without any actual basis therefor. The fact that a person is a public officer does not render privileged the wanton publication of false defamatory statements regarding him. Putnam v. Browne, 155 N. W. 910.

It must be borne in mind that we are only ruling on a demurrer, and hence must assume that all issuable, relevant, and material facts well pleaded in the complaint, are true.

Testing the complaint by the rules heretofore set forth, we are of the opinion that it states a cause of action for libel as defined by § 4352, Comp. Laws 1913.

The order appealed from must be affirmed. It is so ordered.

BIRDZELL and BRONSON, JJ., concur.

ROBINSON, J. This is a political libel suit, and it is no exception to

the rule that every suit is both a public and a private nuisance. Such was the Barnes-Roosevelt Case and the Ford Case. Such suits do often cost the parties several thousand and the public several thousand, and result in a verdict for six cents, or nothing. And if the libel is scandalous or injurious, the suit adds tenfold to the scandal and the injury. In several such libel suits this court has, by a majority vote, overruled a demurrer to the complaint, and still, on reflection, the parties have known better than to bring the suits to trial. Witness the McCue Case, 39 N. D. 190, 167 N. W. 226. In that case, as in this, the complaint is verified. It avers that the plaintiff has been damaged $50,000, a sum exceeding his earnings for ten years. Of course the averment is clearly false, and yet it is in keeping with the character of the suit.

In this and similar cases the formulated opinion of the court and of each judge is booked and published at an expense to the public. Hence we cannot be too careful to refrain from quoting irrelevant matter. In the brief of counsel for plaintiff the libel, and all there is of it, is quoted thus:

### "Langer Wants Control.

"It became clear early in the referendum campaign that two factions were seeking control of the I. V. A. One was headed by Attorney General Langer and the other by President Iverson. Langer visited heads of Minneapolis and St. Paul corporations that are financing the I. V. A., early this year, and demanded that he be made custodian of the slush funds that were expected in North Dakota. His record was against him and these gentlemen turned him down, though politely. Because of this Langer is sore, it was said yesterday, and is attempting to build up a machine of his own."

On this, the comment of the distinguished counsel from Wahpeton is as follows:

"Beyond all question a man who would do what Mr. Langer is charged in this article with having done is a 'damned rascal.' A man who is so utterly devoid of all sense of decency and honor and principle who, while occupying the high office of attorney general of the state, would go to St. Paul and Minneapolis and there demand that money gathered together to be used for corrupt political purposes be turned over to him that he might use it for the purposes for which it was collected is certainly a rascal of the lowest type; and, no doubt, unless in

the meantime he reform, he will eventually be damned,—at least in the estimation of decent people."

In the McCue Case the court held it was not actionable to charge that McCue had boasted of raising a slush fund to help defeat certain candidates for the supreme court. To avoid the effect of that decision the complaint avers that in this case the words "slush fund" were used and understood in a peculiar sense. But the court will take official notice of the words and the sense in which they are used and understood by the people of the state. The words are in everyday use and are common political slang. The court knows, and every person knows, that the words have not a literal meaning, and that money is never used as slush. Indeed, the term "slush fund" is merely a slang term for campaign fund.

Then, on its face, the alleged libel clearly shows that every reader must understand the same as if this were given as an addenda at the foot of the libel, *viz.:*

"Of course the editor was not present when Mr. Langer conversed with the corporation magnates; no reporter was present. Our version of the conversation is only our best guess or conjecture. We do not claim to be clairvoyants or mind readers."

Now it is well known that in state political referendum and nominating campaigns Mr. Langer put himself to the front and became the most prominent person in the politics of the state. He was a candidate for governor and came near to securing the nomination. He had a perfect *right* to go to the Twin Cities and to ask the corporate magnates for a campaign fund, and still there is not a word of evidence that he did it, because the editor was not present, the reporter was not present, and the article shows on its face that what is said of Mr. Langer concerning the "slush fund" is merely a guess or conjecture. The court will take notice of the fact that in the recent political contest Mr. Langer became the leader of several parties that were opposed to the Nonpartisans and its leaders. In 1916 and in 1918, with the strenuous support of the League and these defendants, Mr. Langer was elected to the office of attorney general, and for about three years he worked with the League managers, and enjoyed their trust and confidence and received large appropriations. He was laden with money and honors; in the administration of the state affairs he stood next to the governor. Then,

for some reason, he broke with the League and became the leader of the opposition. He spent several months—a great part of his time—going over the state making speeches and denouncing the League managers and the defendants. Of course the abuse and denunciation became mutual and reciprocal; it became much the same as when two boys go onto the street and commence a contest of slinging mud at each other, and the one who gets the worst of it commences to cry and runs home to mama. There is nothing in the alleged libel which tends to expose Mr. Langer to hatred, contempt, or ridicule, nothing which caused him to be shunned, or which lost him a vote in the race for governor. The libel in question did not injure him to the amount of one cent. If anything, it was a benefit to him, because it advertised him, and, like most politicians, he is fond of seeing his name in print and on the headlines of the newspapers.

It is true that in libel suits decisions can readily be cited on any side of any case. It is true that judges are still disposed to follow a line of decisions which were given when conditions were very different. Time was when newspapers were few, and when political abuse or mudslinging was not a daily occurrence, when an editorial in a newspaper was considered as true as Holy Writ; but of late newspapers have become about as numerous as trees in the forest. Daily papers of eight pages are issued and filled with advertisements, telegrams, political notes, and political abuse. It is so common that few people are so foolish as to give any credence to anything in the line of political abuse. And in this case the libelous article shows on its face that it was merely given as the guess or conjecture of the editor. It did no injury to Mr. Langer; it did not call him a rascal of any type, or impute to him the unpardonable sin or any danger of being damned. In the light of plain common sense, common usage, and common knowledge the complaint does not state a cause of action.


GRACE, J. (dissenting). The complaint states no cause of action for libel. It is clear, and it will be conceded that, by no stretch of imagination, can the articles published be held a libel of the plaintiff, either in his official, professional, or individual capacity; and that the article, or articles, standing alone, are not libelous, and will not support a cause of action.

We think every member of the court would agree to what has been said if it were not for the alleged innuendoes pleaded. We are of the opinion that the alleged innuendoes in explanation of the language used in the articles do not result in stating a cause of action.

"But an innuendo must not introduce new matter or enlarge the natural meaning of words. It must not put upon them a construction which they will not bear. It cannot alter or extend the sense of the defamatory words, or make that certain which is, in fact, uncertain." Newell, Slander & Libel, 3d ed. 755. See cases cited in note 40. "The office of the innuendo is to aver the meaning of the language published. Therefore, if the meaning of the language is plain, no innuendo is needed. The use of it can never change the import of the words, nor add to or enlarge their sense."

Chief Justice Shaw states the law as follows: "The law proceeds on the hypothesis that what is the ordinary meaning and nature and intrinsic force of language is a question of law. When, therefore, words are set forth as having been spoken by the defendant of the plaintiff, the first question is whether they impute a charge of felony or any other infamous crime punishable by law. If they do, an innuendo undertaking to state the same in other words is useless and superfluous; if they do not, such an innuendo cannot aid it. It therefore often happens that where innuendoes are added, which do alter and vary and even inflame and exaggerate the sense of the words much beyond their natural force and meaning, yet such innuendoes are held not to vitiate the declaration.

"The reason of which I take to be this: The words themselves imputing an infamous offense, the innuendo may be rejected as surplusage; and as the plaintiff is not allowed to go into evidence *aliunde*, to show that the words were, in fact, used in the sense imputed by the innuendo, they can have no influence whatever. But, if the words do not impute such infamous crime, by their natural sense and meaning, then, as a general rule, the plaintiff is not entitled to recover, and, as he cannot enlarge that meaning by an innuendo, so as to let in proof of extraneous facts, his action must fail." Newell Slander & Libel, p. 756.

The decision of the majority, as I view it, is a long step in the direction of the destruction of a free press. If such mild expressions as used in the articles complained of may be made the basis of libel suits, when

46 N. D.—29.

clearly such articles are not libelous, soon it will be that every editor, publisher, or owner of a newspaper will be deterred from the mildest criticism of any person, public officer, or candidate for public office, for fear of endless litigation which may be brought against him, and enormous expense which is thereby likely to be heaped upon him.