86 N.J. Super. 217 (1965)
206 A.2d 591
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RICHARD P. BROWNE, DEFENDANT-APPELLANT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DOROTHY STULTS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 13, 1964.
Decided January 20, 1965.
*219 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. John A. Pindar argued the cause for appellant Richard P. Browne (Messrs. Pindar, McElroy, Connell & Foley, attorneys; Mrs. Sonia Napolitano, on the brief).
Mr. Edward H. Saltzman argued the cause for appellant Dorothy Stults.
Mr. Anthony J. Armorc, Assistant Prosecutor, argued the cause for respondent (Mr. John G. Thevos, Passaic County Prosecutor, attorney).
*220 The opinion of the court was delivered by LEWIS, J.A.D.
Defendants Richard P. Browne and Dorothy Stults, by leave of court granted, appeal from interlocutory orders of the Passaic County Court denying their motions to dismiss indictments charging them with the crime of libel and conspiracy to commit libel.
The indictments were the outgrowth of a mayoralty campaign which preceded the November 1961 election in Wayne Township, New Jersey. Browne was the incumbent officeholder running for reelection, and Stults was an active leader among his supporters. George L. Sullivan, a member of the governing body of the municipality, was an opposition candidate for the office of mayor. Ten days prior to the election Sullivan published and circulated an open letter under his signature addressed to the residents of the township which reads:
"As you know I have publicly demanded that Richard P. Browne resign as Mayor. I did so because I have documentary evidence indicating that he planned to use his public office for private profit and did so. I have here reproduced one of the documents upon which I based this demand.
Mr. Browne has threatened to sue me if this document is distributed in our town. But as one of your elected representatives on the governing body these threats cannot and will not deter me from my public duty to you.
You now have this document. You also have the affidavits which verify it. The public records in the municipal building demonstrate how the plan set forth in Mr. Browne's memorandum was implemented by him as an elected official of our town.
No man can faithfully serve two masters. The decision is yours."
The documentary evidence that accompanied his published letter included an introductory statement in large print: "Here is documented proof of the charges against Richard P. Browne," which statement was followed by a notation of the items constituting the document, namely:
"EXHIBIT I  Memorandum written by Browne to his associates indicating that politics `pays off' in private profit.
*221 EXHIBIT II  Sworn affidavit of the secretary who typed Exhibit I from Browne's handwritten memorandum handed to her by Browne.
EXHIBIT III  Sworn affidavit of one of Browne's associates that Browne personally handed him Exhibit I representing that it was a document he had written."
It is unnecessary for the purpose of this opinion to detail the contents of those lengthy exhibits. Suffice it to mention that the purported "memorandum" of Browne to his "associates" was an interoffice communication to his former employer, Fred W. Gardner, a licensed civil engineer and land surveyor of this State, for whom Browne had worked for approximately ten years. The memorandum was captioned "Re: Review of Pending Work for 1961" and described, inter alia, certain local land development plans anticipatorily profitable as engineering projects to the firm with which he was associated. The affiants were Gardner and his secretary, Rose Marie Scanlon, and the jurats were signed by Ernest T. Scheidemann, a notary public. The material thus publicized, all of which is set forth as an exhibit to each of the indictments before us, is plainly defamatory as it unequivocally accused Browne of a breach of public trust during his term of office as elected mayor. That release was obviously calculated to taint Browne's reputation and terminate his public career.
The mayor's first response to the accusatory charges made by his political adversary took the form of a letter denying the authorship of the alleged memorandum to his employer Gardner and declaring the published document to be false. Then followed a campaign "flyer," the sole basis for the series of indictments here involved. Copies were released the day preceding the election and were distributed to the electorate by Browne and Stults.
Our examination of the flyer and Gardner's affidavit shows that his signature on the affidavit differs radically from that shown on the flyer as his "authentic signature."
After the election the Passaic County grand jury investigated the campaign controversy between Sullivan and Browne, *222 and it returned indictments against Browne and five of his political confederates. There were three indictments, as hereafter mentioned. The following language exemplifies the allegations contained therein:
"* * * they [defendants] unlawfully conspired together to unlawfully and maliciously contriving and intending to defame George L. Sullivan, Fred W. Gardner, Rose Marie Scanlon and Ernest T. Scheidemann and each of them, and cause them and each of them to be held up to disgrace, injure and aggrieve them and each of them, unlawfully and maliciously did compose, issue and publish a so-called `flyer' hereto annexed marked Schedule `B' and made part hereof; which contained certain false, scandalous, malicious and defamatory libel concerning George L. Sullivan, Fred W. Gardner, Rose Marie Scanlon and Ernest T. Scheidemann and each of them, uttering among other things the false, malicious, defamatory and libelous matters following, to wit:
`Why did Sullivan wait until only a few days before election to distribute his so-called "Documented Proof."`Sullivan didn't want his so-called "Documented Proof" put to a test  that's why he waited until a few days before election to distribute it.' `Who signed the Gardner affidavit appearing in Sullivan's "Documented Proof"? Again we ask who signed Sullivan's so-called affidavit and why?', * * *."
The indictments further indicate that the gravamen of the alleged offense is predicated upon certain innuendoes present in the flyer, namely: Sullivan, Gardner, Scanlon and Scheidemann had conspired to and did issue a false document embracing a forged affidavit of Gardner and containing a false jurat notarized by Scheidemann, as well as a false affidavit sworn to by Scanlon.
On application of the prosecutor the indictments were dismissed as to all parties except Browne and Stults. Upon motions for dismissal by those two remaining indictees, the trial judge concluded:
"* * * It is obvious that these statements in the flyer go beyond the defensive declarations. They are a counter-attack on Sullivan, in an attempt, not only to discredit the memorandum and attached affidavits, but to impeach the honesty of the others, Gardner, Scanlon and Scheidemann."
*223 The court dismissed the first three counts but retained the fourth count of the indictment against Browne for criminal libel as to Sullivan, Gardner, Scanlon and Scheidemann; retained the three counts of the indictment against Browne and Stults for the same offense against the same individuals, and retained the indictment against Browne and Stults for conspiracy to commit criminal libel against the four persons afore-mentioned.
In this appeal from that determination defendants have filed separate briefs in which they advance concordant arguments challenging the validity of the indictments because (1) they fail to state facts sufficient to constitute a crime, do not adequately inform the accused of the nature and the cause of the accusations, the allegations therein do not disclose subject matter libelous per se, and they fail to conform to the constitutional mandate (N.J. Const. 1947, Art. X, par. 3) that all indictments shall conclude: "against the peace of this State, the government and dignity of the same," as that required language is recited only on the yellow backing stapled to the indictments; (2) the innuendoes asserted to imbue Browne's publication with a defamatory meaning do not have that effect; (3) the so-called "flyer" was privileged as a matter of law, and (4) the charge of conspiracy is not sustainable.
The critical issue is the legal sufficiency of the indictments. Defendants maintain, relying upon authorities seemingly supportive of their contention, that libel is not criminally punishable unless it may tend to provoke a breach of the peace, and that such an allegation is a necessary constituent element of a valid indictment. In our approach to the pending problem we cannot be oblivious to the evolutionary changes in the history of criminal libel actions and shall, therefore, consider in limine (a) some significant highlights in the early development of criminal libel, (b) shifting emphasis in the law, (c) prevalent atrophy of prosecutions for such offenses, and (d) the controlling authorities to be followed. We shall then analyze the indictments against the defendants in light of the foregoing unfoldment.

*224 A.
The origin of criminal defamation reverts to the Babylonian Code of Hammurabi, circa 2250 B.C., which made it a punishable offense for a man to point a finger at a priestess or the wife of another man unless he could justify it. See Code as translated by Robert Francis Harper, § 127, p. 45. In English law it stems from 1275 A.D. when the Royal Courts of that country first obtained jurisdiction over libel and slander under the DeScandalis Magnatum (Libel of "Great Men"), 3 Edw. I, c. 34, enacted to preserve order and peace in a feudal system of government by enforcing the obligation of the people to their traditional rulers. By 1497 A.D. the law was extended to enable magnates in a civil action for libel to collect damages against those who defamed them. After the Reformation the King, through his Council and the Star Chamber, punished libelers to preserve peace and to protect the kingdom. In the case of DeLibellis Famosis, 5 Co. Rep. 125a, 77 Eng. Rep. 250 (1609), which arose out of a libel in verse directed against a deceased Archbishop of Canterbury and a living Bishop, the common law of criminal libel was established. It is evident that in the pattern of English jurisprudence the corpus of criminal libel served to shield the sovereign and those in authority from the threat of insurgency. Truth, no matter how well motivated, was no defense, and this gave currency to the axiom, "the greater the truth, the greater the libel." Kelly, "Criminal Libel and Free Speech," 6 Kan. L. Rev. 295, 302 (1958).
Through an evolutionary process, any written statement which tended to incite public disorder, regardless of the truth or falsity thereof, was determined to be sufficient to sustain a criminal libel conviction. The impending fear of a breach of the peace became a sine qua non for collective social action to vindicate the harm directed towards an individual or an identifiable group. As mentioned in Newell, The Law of Slander and Libel (4th ed. 1924), § 828, pp. *225 934-935, "Everything, therefore, written of another which holds him up to scorn and ridicule that might reasonably be, according to our natural passions, considered as provoking a party to a breach of the peace, is a libel, and indictable as such." Note, 4 Blackstone, Commentaries on the Laws of England 151 (1868). See generally, Yankwich, It's Libel or Contempt If You Print It (1950); Kelly, op. cit., supra (containing a detailed historical survey).

B.
Our courts have frequently referred to common law libel, but its application has always been subject to the modification thereof as engendered by the celebrated trial of John Peter Zenger in New York, 17 Howell's St. Tr. 675 (1735), the American Revolution and subsequent constitutional declarations. The First Amendment to the Constitution of the United States forbids the enactment of any law by Congress "abridging the freedom of speech, or of the press." Similarly, our State Constitution provides that "No law shall be passed to restrain or abridge the liberty of speech or of the press," and that "In all prosecutions or indictments for libel, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." (Art. I, par. 6). The individual is now hedged with many basic safeguards, unknown to the common law of the Blackstone era, before he may be convicted of criminal libel.
While recognizing the common law breach-of-the-peace theory, the courts have not required a factual showing of violence, either actual or potential. In most modern criminal libel statutes that element is omitted, thereby indicating that such legislation is not solely designed to prevent violence. The trend is away from considering a threatened breach of the peace as a singular basis for criminal prosecution, and it *226 has moved toward placing the emphasis upon the tendency of the publication to damage the individual regardless of its effect upon the public. See 3 Underhill's Criminal Evidence (Herrick 5th ed. 1957), § 696, pp. 1637-1638; 2 Anderson, Wharton's Criminal Law and Procedure, § 883, pp. 748-750 (1957); Odgers, Libel and Slander (6th ed. 1929), p. 580; Annotation, 19 A.L.R. 1470 (1922); Kelly, op. cit., supra, at p. 320. Compare Earl v. Winne, 14 N.J. 119, 126 (1953), and note the dissenting opinion in Blum v. International Ass'n of Machinists, AFL-CIO, 42 N.J. 389 (1964), wherein Mr. Justice Francis, after referring to libel as a crime at common law, said:
"The criminality was found in the utterance of scurrilous `fighting words,' which experience had shown were likely to provoke an immediate breach of the peace. It was found also, as a secondary factor, in the great capacity libel has for harm to the reputation of the victim." (at pp. 404-405)
Citing, inter alia, Beauharnais v. Illinois, 343 U.S. 250, 254-257, 72 S.Ct. 725, 96 L.Ed. 919 (1952).
If the breach-of-the-peace test were to be applied exclusively, perhaps it would never be a crime to libel persons not capable or prone to provoke a public disturbance.
We hold that the indictments under review are not fatally defective in failing to charge that the alleged libels had a tendency to provoke a breach of the peace.

C.
Professor Leflar, in the preparation of a treatise entitled The Social Utility of the Criminal Law of Defamation, made an analytical study of the criminal libel cases appearing in the appellate reports since 1897. During the period from 1920 to 1955, there were 91 reported cases that charged criminal libel, and approximately half of that number were classified as distinctly political. The author questioned the function served by criminal libel laws when there are so many violations of the law which produce so few prosecutions, and still fewer *227 convictions that stand up on appeal, and he concluded, "The fact is that defamation is a medieval crime from which the aura of public interest has substantially departed with the passage of time." 34 Texas L. Rev. 984, 1034 (1956).
While the publication of written defamation may be a crime as well as an actionable civil wrong, a man whose private character has been attacked should, as a general proposition, content himself with a civil remedy. Gatley on Libel and Slander (5th ed. 1960), p. 12. Cf. Mosler v. Whelan, 28 N.J. 397, 399 (1958). The extreme thinking on the subject was expressed in 1920 by a dissenting judge in Langer v. Courier-News, 46 N.D. 430, 445-446, 179 N.W. 909, 915 (Sup. Ct. 1920), who declared, "This is a political libel suit, and it is no exception to the rule that every such suit is both a public and a private nuisance." Note also Comment, "Libel and the First Amendment," 50 A.B.A.J. 786-787 (1964), citing references to Mr. Justice Black's declared theory that all libel actions, civil or criminal, are unconstitutional as a violation of the "absolute" protection of the First Amendment to the United States Constitution.
In a recent pronouncement, Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), reference was made to the changing mores and the virtual disappearance of criminal libel prosecutions, with an observation quoted from Emerson, "Toward a General Theory of the First Amendment," 72 Yale L.J. 877 (1963):
"* * * under modern conditions, when the rule of law is generally accepted as a substitute for private physical measures, it can hardly be urged that the maintenance of peace requires a criminal prosecution for private defamation." (at p. 924)
The court, in its opinion, commented upon the absence of any criminal libel provisions in the Proposed Official Draft of the Model Penal Code prepared by the American Law Institute. That omission has been explained by the ALI reporters:
"It goes without saying that penal sanctions cannot be justified merely by the fact that defamation is evil or damaging to a person *228 in ways that entitle him to maintain a civil suit. Usually we reserve the criminal law for harmful behavior which exceptionally disturbs the community's sense of security. * * * It seems evident that personal calumny falls in neither of these classes in the USA, that it is therefore inappropriate for penal control, and that this probably accounts for the paucity of prosecutions and the near desuetude of private criminal libel legislation in this country." Model Penal Code, Tent. Draft No. 13, 1961, § 250.7, Comments, at p. 44
It is noteworthy that New Jersey has never adopted general criminal libel legislation. N.J.S. 2A:120-1 relates only to "Securing publication, broadcasting or televising of defamatory statements or representations," and N.J.S. 2A:43-1 was enacted to afford immunity to certain official statements given to the press. R.S. 2:157B-5 (not re-enacted), which contained restrictions upon individual freedom of speech, was declared unconstitutional in State v. Klapprott, 127 N.J.L. 395 (Sup. Ct. 1941), by a decision indicating an area of basic weakness in traditional criminal libel when scrutinized conjunctively with rights constitutionally guaranteed.

D.
The vagarious and complex structure of libel law today is the direct consequence of the friction between it, as a limitation on untrammeled freedom of expression, and the highly cherished right of free speech. Vide, Swede v. Passaic Daily News, 30 N.J. 320, 331 (1959); Cowan, "Rule or Standard in Tort Law," 13 Rutgers L. Rev. 141, 146 (1958). Out of such interaction between fundamental policies arose a series of limitations on the successful prosecution of libel actions which are calculated to protect the author of libelous utterances when a paramount public need arises. The law of privilege and fair comment evolved as a matter of public policy in furtherance of our democratic and fundamental right of free speech. See Coleman v. Newark Morning Ledger Co., 29 N.J. 357 (1959); Barr v. Matteo, 355 U.S. 171, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957). It counter-balances the equally basic right to enjoy reputation "unimpaired *229 by false and defamatory attacks." Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 557 (1955). The courts recognize "a privilege or immunity which may be absolute or qualified; the difference is that the absolute privilege [e.g., judicial proceedings or legislative debate] affords complete protection whereas the qualified privilege affords protection only if there is no ill motive or malice in fact." Id., at page 558.
The essentials of qualified privilege regarding matters of public concern in this State, allowing "fair comment" to be undeterred by civil or criminal liability, are fully discussed in Leers v. Green, 24 N.J. 239, 254-255 (1957). See also 3 Restatement, Torts, § 607; 1 Harper and James, The Law of Torts, § 5.21, p. 419 (1956); Prosser, Torts (2d ed. 1955), § 95, pp. 606-629; Annotation, 19 A.L.R. 1470, 1489 (1922).
In Dressler v. Mayer, 22 N.J. Super. 129, 134 (1952), this court adopted by quotation a statement from 33 Am. Jur., Libel and Slander, § 169, p. 161 (1941):
"Although there are a few decisions to the contrary, the great weight of authority supports the view that publications dealing with political matters, public officers, and candidates for office are entitled to a measurable privilege by reason of the public interest involved therein. The principal limitations upon the rule are that the statements must be within the bounds of fair comment and must not be motivated by actual malice."
Mr. Justice Francis, speaking for our Supreme Court in Mosler v. Whelan, supra, a civil libel case, made an observation that is here appropriate for quotation:
"The evidence adduced at the trial might well justify a description of the borough of Paramus, locale of origin of this controversy, as a seething cauldron of political tempest. Such characterization is not disparaging of the borough, for controversy in political and civic affairs resulting from intense interest on the part of the citizenry ordinarily makes for good and responsible government. Short tempers, injudicious language and sometimes indecorous insults, although much to be decried, are concomitants of such a scene. The process of free debate in political controversies and campaigns is a time-honored *230 American tradition. It is indispensable to our way of life and the law of libel should not be permitted to encroach unduly upon it. The problem of harmonizing the right of the individual to his good name with the need of a democratic society to full and free expression is frequently a delicate one in the area of politics. The ordinary citizen is well aware that in the day-to-day contest persons engaged in that activity are praised by their adherents and assailed by their adversaries. He has become accustomed to reading both good and bad comments about the candidates and those associated with them, and he may reasonably be expected to understand that the partisan outpourings are likely to be biased and exaggerated and to accord no greater credence to one viewpoint than to the other." (28 N.J., at p. 399)
In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), after an extensive analysis of the interrelationship of constitutional freedom of speech, the protective right to shield one's reputation, and the undeniable necessity in a free society for the unfettered exchange of views regarding those in public service and those seeking public office, it was stated:
"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'  that is, with knowledge that it was false or with reckless disregard of whether it was false or not. * * * We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." (376 U.S., at pp. 279-280, 283; 84 S.Ct., at pp. 726-727; emphasis supplied)
Although plaintiff in that case was a city commissioner of public affairs, the court in its opinion approvingly quoted the rationale of Justice Burch in Coleman v. MacLennan, 78 Kan. 711, 724, 98 P. 281, 286 (Sup. Ct. 1908), where a candidate for public office was involved:
"`[I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of *231 individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great and the chance of injury to private character so small that such discussion must be privileged.'" (376 U.S., at p. 281, 84 S.Ct., at p. 726)
The requirement of "actual malice" as now defined creates an affirmative burden of proof, in civil libel actions involving public activities, upon a plaintiff who is a public officeholder or a candidate for such an office. It is an essential element of such a proceeding in order to afford critics of such officials or candidates not only protection from ultimate liability where no falsification of fact is proven, but also to save them from the embarrassment and expense of trial if the plaintiff fails to allege such falsity in his pleadings. Note, Annotation, "Constitutional Aspects of Libel or Slander of Officials," 95 A.L.R.2d 1450, 1454 (1964).
The New York Times Co. v. Sullivan case was followed by the Pennsylvania Supreme Court in Clark v. Allen, 415 Pa. 484, 204 A.2d 42 (Sup. Ct. 1964) (civil suit by plaintiff, a candidate for reelection to United States Senate); extended by dictum in Pauling v. News Syndicate Company, 335 F.2d 659 (2 Cir. 1964) (to any "participant in public debate on an issue of grave public concern"); applied in Pearson v. Fairbanks Publishing Co., 33 U.S.L. Week 2307 (Alaska Super. Ct. 1964) (to an internationally known news columnist, actively supporting a candidate for public office); and it was considered by this court in Nusbaum v. Newark Morning Ledger Co., 86 N.J. Super. 132 (App. Div. 1964) (a civil libel action by a private citizen against a newspaper company). Also note, Harper v. National Review, Inc., 33 U.S.L. Week 2341 (Sup. Ct. 1964).
A sequel to New York Times Co. v. Sullivan is the criminal libel case of Garrison v. State of Louisiana, supra, wherein the United States Supreme Court announced that the constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy, saying:
*232 "* * * only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our `profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' [citing New York Times Co. v. Sullivan, supra, 376 U.S., at p. 270, 84 S.Ct. 721]." (379 U.S., at p. 74, 85 S.Ct., at p. 216)

THE INDICTMENTS
In New Jersey indictments must contain a written statement of the essential facts constituting the offense charged, R.R. 3:4-3, and they must be examined "in the light of the constitutional provisions, the rules of court and the decisions." State v. Winne, 12 N.J. 152, 178 (1953). Additionally, the rules of civil pleading are applicable to an indictment for libel. State v. Mott, 45 N.J.L. 494 (Sup. Ct. 1883). See also O'Regan and Schlosser, Criminal Laws of New Jersey, § 1141, p. 748 (1942). If the requisite elements of the purported crime do not appear on the face of the charge, it cannot be sustained. State v. Renner, 74 N.J.L. 148, 150 (Sup. Ct. 1906). Cf. State v. DeVito, 6 N.J. Super. 344, 347 (App. Div. 1950).
In the instant case the only statement of relevant facts in the article circulated by Browne is the reproduction of the Gardner signatures, which was accompanied by questions, comment, opinion and an invitation to compare the handwritings. Furthermore, the indictments sub judice allege no additional facts, but annexed to each indictment was a copy of the Sullivan "documented proof" and a copy of the Browne flyer.
It is plain from a reading of the indictments that they do not aver "actual malice," i.e., any knowledge on the part of the defendants that both of the apparently different Gardner signatures shown on the Browne flyer were genuine (if in fact they were), or that there was any reckless disregard by defendants as to the truth of those facts within the meaning of *233 "actual malice" as defined in the New York Times and Garrison cases. Nor do the indictments allege knowledge by defendants of any other facts which would negate their belief in the truth of the alleged innuendoes, or show reckless disregard by defendants of any such facts.
The word "malice" has a penumbra of uncertainty around it. The expressions "malicious" and "maliciously" as employed in the indictments under consideration connote what has been judicially recognized as "legal malice," which as an ingredient of an action for slander and libel "signifies nothing more than a wrongful act done intentionally, without just cause or excuse." Coleman v. Newark Morning Ledger Co., supra, 29 N.J., at page 373, quoting from King v. Patterson, 49 N.J.L. 417, 419 (E. & A. 1887); in other words, an absence of any privilege. See Prosser, "Injurious Falsehood: The Basis of Liability," 83 N.J.L.J. 1, 5 (1960), citing Fridman, "Malice in the Law of Torts," 21 Modern L. Rev. 484 (1958).
It is equally clear that Sullivan, who was allegedly maligned by Browne's flyer, was not only an elected municipal official but he was also a candidate for the office of mayor, the position then held by Browne. In his "documented proof," which provoked the retaliatory flyer, Sullivan specifically identified himself to the residents of Wayne Township "as one of your elected representatives on the governing body," and reference therein was made to "his public duty" to the electorate and to "the public records in the municipal building."
Under the authority of the 1964 decisions of the highest court of our land, the indictments against the defendants for the reputed libel of Sullivan are constitutionally unsupportable and should be dismissed.
Independently, the material contained in the indictments, or annexed thereto as exhibits, shows that the Browne flyer was purely defensive to a provocative libelous publication by Sullivan against Browne. The initial libel and the subsequent counterattack arose out of the same transaction. *234 The Browne flyer was therefore within the protection of the privilege pertaining to "defensive declarations." See Am. Jur., op. cit., supra, § 134, p. 133; 1 Harper and James, op. cit., supra, § 5.17, pp. 401-402. We so determine as a matter of law, on the face of what appears in the indictments and the exhibits thereto. State v. Schmitt, 49 N.J.L. 579, 586 (Sup. Ct. 1887). We disagree with the State's contention that the Browne flyer contained more than was fairly appropriate to meet the Sullivan attack on Browne.
There remains to be considered the State's contention that Gardner, Scanlon and Scheidemann, neither officeholders nor political candidates, nor the target of the Sullivan attack, were criminally defamed. The "actual malice" doctrine is not necessarily applicable in relation to them. The existence vel non of libelous criminality in relation to those parties depends upon the reasonableness of the allegedly defamatory inferences as stated in the indictments. The function of an innuendo was aptly summarized in State v. Mott, supra:
"Therefore, in an indictment for libel by the publication of words, not libelous in themselves, or not of themselves pointing at the person alleged to be injured, the settled and well-recognized practice has been to aver the facts requisite to be connected with the words, to show their defamatory character, by way of inducement in a prefatory statement; to declare, by a colloquium, if necessary, that the publication was of and concerning the person alleged to be injured, and then to point the meaning of the words by innuendoes, the function of which is, as was said by Lord Mansfield, `by reference to preceding matter, to fix more precisely the meaning of it.' Rex v. Aylett, 1 T.R. 63." (45 N.J.L., at p. 495)
Accord, State v. Reade, 136 N.J.L. 432, 434 (Sup. Ct. 1948); State v. O'Hagan, 73 N.J.L. 209, 212 (Sup. Ct. 1906), wherein the indictments were found to be faulty in that they contained no averment of facts to show that they bore a defamatory sense.
In analyzing the distributed flyer to ascertain the requisite facts, we should bear in mind, as already noted, that it was Browne's responsive declaration to Sullivan's document traducing the mayor's integrity and character. The imputation *235 was that Sullivan had prepared and circulated a false document. The attack was against Sullivan in refutation of the derogatory criticism previously directed towards Browne. Certainly, the Browne flyer cannot by the remotest inference be read as charging Gardner with forging his own affidavit, and it obviously did not accuse Scanlon, the typist of the memorandum, or Scheidemann, the notary public, with any wrongdoing  neither Scanlon nor Scheidemann was mentioned in Browne's publication. Even if we indulge the speculative inference that readers of the Browne flyer had Sullivan's "documented proof" before them, it would have been evident that Scanlon was not reputed therein to have had anything at all to do with the preparation of the Gardner affidavit; and any inference that Scheidemann, the notary public who took the Gardner affidavit, participated in a forgery of the signature therein is, as a matter of law, so ephemeral as not to be supportable as an innuendo.
It is for the court to determine whether a communication is capable of a libelous meaning and also whether the matter commented on is one of public concern. Coleman v. Newark Morning Ledger Co., supra, 29 N.J., at page 382. We conclude from our study of the record that the impugned flyer published by defendants is not reasonably susceptible of the alleged defamatory import attributed to it by the State in relation to Gardner, Scanlon and Scheidemann. We have already decided that it is not criminally actionable in relation to Sullivan.
It is unnecessary to discuss in this opinion the rest of the points raised on appeal.
The orders denying the motions to dismiss the indictments under review are reversed, and the matters are remanded to the County Court for entry of judgments dismissing the indictments.