# HOUSING AND REDEVELOPMENT AUTHORITY OF MINNEAPOLIS v. PHILLIPS PETROLEUM COMPANY AND OTHERS.
## AJAX AUTO PARTS, INC., RESPONDENT.

202 N. W. 2d 214.

November 3, 1972—Nos. 42978, 43096.

*Fredrikson, Byron & Colborn, Terence M. Fruth,* and *S. Charles Sorenson, Jr.,* for appellant.

*Albert H. Newman,* for respondent.

Heard before Knutson, C. J., and Otis, Kelly, and Hachey, JJ.

KELLY, JUSTICE.

This action began when the Housing and Redevelopment Authority in and for the city of Minneapolis (HRA) sought to condemn certain property on the west bank of the Mississippi River. Ajax Auto Parts, Inc., (Ajax) was one of the landowners. Both parties appealed from the commissioners' award of $83,403. The jury returned a verdict of $107,683 for the land and $5,403 for fixtures. HRA now appeals to this court from the judgment and from the district court's order which denied HRA's motion for a new trial. We affirm.

On April 5, 1968, the date of the taking, Ajax owned and operated a shop at 1613 South Seventh Street in Minneapolis, selling new and rebuilt auto parts. The normal procedure in the business was that Ajax would buy junked cars, strip them of salable parts, and take the auto bodies to a salvage yard.

At the trial, an owner and officer of Ajax and two experts testified for Ajax. Ajax made the point several times in the trial that it was not asking compensation for the loss of good will or of any licenses to do business, and the witnesses did not include any such considerations in their opinions as to value. However, some of the testimony on behalf of Ajax as to the market value of the subject property was based on the opinion that the highest and best use of the property was that of operating a new and rebuilt auto parts shop.

HRA opened its case by seeking to prove that Ajax was operating illegally and that such an operation should not be considered as enhancing the value of the property. Section 220.010 of the Minneapolis Code of Ordinances requires one who operates an "automobile wrecking yard" or "junk yard" to obtain a permit. Another ordinance, § 221.010, requires one who operates

a secondhand or junked car lot to obtain a permit. HRA offered to prove that Ajax was operating illegally without either of these permits although it had been in business for 17 years or more on the property being condemned. Ajax did have two licenses—one under Minneapolis Code of Ordinances, c. 357, as an automobile dealer, and another under c. 334 as a dealer in secondhand goods or junk. The latter ordinance defined a secondhand goods dealer as a "person engaging in the business of buying or selling, or both, of secondhand goods of any kind, including wrecked or dismantled motor vehicles or motor vehicles intended to be wrecked or dismantled * * *." § 334.010(2). The trial court refused to admit evidence that Ajax did not have permits under cc. 220 and 221. The court also refused to give an instruction requested by HRA that no enhanced value could be attributed to the property by virtue of any illegal use. HRA contends that the offered evidence should have been admitted and an appropriate instruction given.

Before refusing to allow the introduction of evidence as to the two permits, the trial court advised counsel for HRA that he would deny the offer of proof unless HRA was prepared to show that this was an illegal operation, that there was a reasonable likelihood that it would be required to cease, and that the premises were therefore less valuable. The trial court took the position that, if none of HRA's witnesses was prepared to testify that the possibility that Ajax would be required to cease its operations affected the value of the premises, then to allow evidence of the lack of two permits would be to allow an inquiry into a collateral matter. The trial judge, having heard evidence that the city had zoned the property for light industrial use and had permitted its use as a new and used auto parts shop under licenses granted to Ajax, properly concluded that there was an insufficient offer of proof. One of the licenses granted to Ajax authorized it to deal in secondhand goods, including motor vehicles intended to be wrecked or dismantled. An inference may be drawn from that license that Ajax had a right to dismantle

motor vehicles, and this inference is buttressed by the fact that the city had permitted the operation for years. Thus, presumably, city officials construed the license granted to Ajax as being a permit for its operations. HRA has not pointed out any evidence in this case that would require a determination that Ajax was operating a junk yard or automobile wrecking yard. Indeed, HRA has not pointed out any definition in the city ordinances of a junk yard or automobile wrecking yard.

The status of the record here is such that we cannot say that Ajax was operating an automobile wrecking yard or junk yard. Ajax did not store motor vehicles after they were stripped of usable parts but had them hauled away for wrecking. It does not appear from the evidence as a whole or from the offer of proof that there was any reasonable possibility that Ajax would be forced to cease its operations or that the operations were illegal. The offer of proof was properly rejected.

We are not unmindful of the general rule of law that a landowner is not entitled to receive payment for any enhanced value which is attributable to its illegal use. 4 Nichols, Eminent Domain (Rev. 3 ed.) § 12.322. However, the instant case cannot be equated with other cases where the use giving rise to the enhanced value is absolutely prohibited by law or there is such a reasonable likelihood of such use being prohibited that the enhanced value is adversely affected thereby.

Over a year before the jury trial, HRA served notice upon Ajax of its intent to offset monthly rental value of the subject property from and after the date of taking. Fourteen months elapsed before Ajax objected to HRA's offset claim. Following the trial, HRA again asserted the claim as a ground for its motion for reduction of the verdict or a new trial. At the hearing on this motion, HRA's only witness as to the rental value of the property admitted that he had not inspected the property since before the date of the taking. The trial court refused to admit his monthly rental value estimate because of a lack of foundation.

In State, by Mondale, v. Bohnen, 273 Minn. 266, 269, 140 N. W. 2d 838, 841 (1966), this court stated:

"* * * To fix this value in the ordinary case there must be a separate assessment of it by witnesses who have taken into account the effect of the condemnation. The trier of fact should have the benefit of this evidence before a determination is made."

There was evidence in the case that, due to work being done around the property, the utility of the property was diminished between the time of the taking and the time the premises were vacated. Obviously, a monthly rental value based upon the utility and condition of the property on the date of the taking without taking into account any and all changes occurring thereafter and adversely affecting the utility of the property would be meaningless. HRA also attempted to have its expert testify to the monthly rental value based upon the market value of the property at the date of taking as found by the jury and upon his knowledge of the property on that date without taking into account any changes in the property or its utility after that date. It is conceivable that the property might have a high market value as of the date of taking and little or no rental value thereafter if it was of little or no use to any prospective tenant because of changes in the property or in the surrounding area. Thus, an opinion as to rental value based solely on the market value at the date of taking would be baseless.

HRA contends that while Bohnen required an appraiser testifying to the rental value of the property to take into account the consequences of the taking itself, it did not require the witness to consider changes not incidental to or resulting directly from the taking. This contention cannot be supported by the language used in Bohnen where this court stated (273 Minn. 269, 140 N. W. 2d 841):

"The value of the condemnee's use of the condemned property between the time of the award and the relinquishment of posses-

sion is the fair and reasonable market value of the use of such property during this period."

In support of that quotation, this court cited Ford Motor Co. v. City of Minneapolis, 147 Minn. 211, 179 N. W. 907 (1920), where this statement was quoted with approval:

"* * * The rental value * * * means simply the value of the use of land for any purpose for which it is adapted in the hands of a prudent and discreet occupant upon a judicious system of husbandry." 147 Minn. 215, 179 N. W. 909.

How could an expert know the purpose for which the property is adapted unless he knows about the conditions affecting the utility of the property, such as ingress and egress. It follows that any factor affecting the rental value of property used by a landowner after the date of taking should be known to an expert witness and would have to be taken into account in arriving at that value. Bohnen did not exclude such factors but merely pointed out (273 Minn. 269, 140 N. W. 2d 841):

"* * * A significant factor in fixing this value is the certainty that possession will be taken by the condemnor in a limited period of time. In contrast, before condemnation one interested in using the realty has a reasonable expectation that his use and possession will continue so long as a rental arrangement is made on terms satisfactory to the owner. Everything else being equal, therefore, it is evident that the fair and reasonable market value of the use of condemned property will be substantially less after condemnation than before. To fix this value in the ordinary case there must be a separate assessment of it by witnesses who have taken into account the effect of the condemnation. The trier of fact should have the benefit of this evidence before a determination is made."

Thus, the certainty that possession will be taken by the condemnor is only one factor in addition to all other factors that should be known to an appraiser and taken into account in arriving at the fair rental value.

HRA contends that Ajax failed to raise a timely objection to HRA's claim and now should be precluded from doing so. The proper procedure was outlined in Bohnen (273 Minn. 268, 140 N. W. 2d 841):

"Whatever confusion exists on this point will be avoided in the future if the state will notify the landowner in writing a reasonable time prior to trial of its intent to claim an offset for the landowner's use of the condemned property subsequent to the filing of the award, stating in the notice the amount to be claimed. If the amount so claimed is not accepted by the landowner, the proper procedure will be for him to serve notice upon the state within 10 days thereafter of his grounds for disagreement."

While Ajax's counsel did not act properly by waiting over 14 months to object to the offset claim, we do not believe that Ajax should be precluded from its objection because its attorney failed to follow the procedure suggested in Bohnen. HRA had no right to assume, in the midst of a vigorously contested condemnation proceeding, that the lack of objection meant acquiescence by Ajax. Bohnen did not explicitly state that a landowner's failure to object to an offset claim within the time suggested in that case would be a bar to any objection thereafter. We consider the procedures outlined in Bohnen to be a suggested method of initiating negotiations whereby one issue might be settled without submitting it to the court.

It is true that by reason of the trial court's ruling HRA loses the benefit of an offset. But under Ford Motor Co. v. City of Minneapolis, *supra,* the burden is upon the party claiming the offset to prove the extent of the use as well as the rental value.

Affirmed.

MR. JUSTICE TODD and MR. JUSTICE MACLAUGHLIN, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.