# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-20-00613-CV

---

**Jack Tanner Thibodeaux and Karlie Ann Thibodeaux, Appellants**

**v.**

**Starx Investment Holdings, Inc. d/b/a Georgetown Collision Center, Appellee**

---

**FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
NO. 20-0827-C368, THE HONORABLE RICK J. KENNON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This case arises out of posts made by appellants Jack and Karlie Thibodeaux and other Internet users on Facebook and other social-media outlets and websites, expressing their dissatisfaction with the service Jack received when he had his truck towed to appellee Starx Investment Holdings, Inc. d/b/a Georgetown Collision Center ("GCC") for repair after a car accident. GCC sued the Thibodeauxes for defamation, business disparagement, conspiracy, and aiding and abetting. Jack and Karlie each moved to dismiss the claims against them pursuant to the Texas Citizens Participation Act (TCPA).[1] *See generally* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011; *see also In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding) ("The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First

---

[1] Because appellants share the same last name, we use their first names when referring to them individually.

Amendment rights, not to dismiss meritorious lawsuits."). The Thibodeauxes now appeal the denial by operation of law of their motions to dismiss. For the reasons explained below, we will reverse and remand in part and affirm in part.

## BACKGROUND

On March 16, 2020, Jack had his 2016 GMC Sierra 1500 Denali Crew Cab truck towed to GCC for repair after he collided with a sign when he swerved to avoid a deer. From the photos in the record, it appears that the windshield was shattered and that the front and side of the truck were also damaged. Jack digitally signed paperwork authorizing work to be done on the vehicle to repair it to its pre-collision condition.

GCC asserts, and the GCC paperwork signed by Jack also reflects, that customers are told that GCC's priority is doing its work correctly and they should not expect to have their vehicle back for at least 30 days or longer. GCC's notice states that although GCC rarely has a vehicle for more than 60 days, it happens from time to time if there are issues with the insurance company or parts. Jack digitally signed various paragraphs of the notice that explained the length of time he should expect to be without a vehicle and that GCC would not call to give updates on a daily or weekly basis but would call to inform of any issues that might arise during the repair process or if the vehicle would be ready sooner or later than the initial 30-day expectation.

Jack attested in his affidavit that the initial oral estimate he was given was that his vehicle's repairs would be completed by March 26 and that the cost of the repairs would be $5,000. According to Michael Fullerton, GCC's custodian of records, in addition to the normal delays caused by needing to order parts, there were additional delays because of the COVID-19 pandemic and the ensuing "stay home" orders. After GCC began the "tear-down" process on Jack's truck,

2

it discovered and documented "additional and significant damage" needing repair, which it communicated to GEICO, Jack's insurance company, and which GEICO approved. Part of the damage to Jack's truck included the vehicle's airbag-and-seatbelt-restraint system, which required replacement. GCC was unable to complete the reprogramming of the replaced master program, so it had the safety system repaired at an authorized dealer, and then the vehicle was returned to GCC.

Jack attested that after GCC told him that they were having someone who worked for a third-party shop pick up his truck to clear the codes in order to complete the repairs over the weekend of May 8, Jack informed Scott Starkes, GCC's owner, that he wanted to pick up the truck and have it towed to a dealership. Jack further averred that Starkes refused to allow him to pick up his truck and stated that if Jack showed up at the property, Starkes would call the police and press charges against him for trespassing. Jack contacted the Williamson County Sheriff, who sent a deputy to GCC, but the deputy left without requiring the release of the vehicle after GCC advised him of the vehicle's unsafe condition. The deputy told Jack that GCC was working on fixing the codes and that he should just wait because the vehicle would be ready on Monday, May 11.

The parties dispute what happened when Jack arrived to pick up the vehicle on May 13, 2020. GCC asserts that Jack refused to let them complete the cleaning and detailing work that was in progress when he arrived and refused to do an inspection of the vehicle with GCC. GCC does not dispute Jack's allegation that there were a few shards of glass remaining in the air-vent system and along the dash, which he alleges he discovered as he drove away.

Jack attested that he asked about going over the estimate and also asked about his deductible and any paperwork he would need to sign but was told that he would not receive any

3

paperwork because GCC's printer was broken. According to Jack, he arrived at 4:00 p.m. and waited until 5:30 for them to finish detailing his truck, despite having called ahead for confirmation that it was ready. He attested that he "overheard the owner say he did not want to deal with [Jack]," so he waited outside until his truck was ready to avoid any conflict. He further attested that his truck had not been detailed and was "in terrible condition"; that "[t]he original markings from the estimate remained on my vehicle, there was debris all over my bed, glass on the floorboards, tears in my seats, broken radio, and filthy headliner"; and that as he left, glass slid through his dash and landed on his lap.

On the afternoon of May 15, 2020, Jack posted a detailed account on his personal Facebook page of his experience with GCC, including the statements that GCC alleges are defamatory, which are detailed below.[2] Jack attested that his "intentions were to inform his family and friends on Facebook of my experience." He further attested that shortly after he posted, his post was shared multiple times "by random people," and that someone tagged GCC. Karlie reposted Jack's post to her own Facebook page, made efforts to spread the post to local news stations, and encouraged people to "report to BBB! Yelp! Google! Spread the word!" She also thanked the people who reported that they had posted and left online reviews about GCC for "spreading the word." She testified that her intention in sharing Jack's post was that "people would be more careful about who they choose and make sure they do research and read Google and Yelp reviews before they choose a place to go."

---

[2] The full Facebook post is attached as an appendix to this opinion, along with the review Jack posted on the Better Business Bureau website. GCC's Facebook response (omitting the invoices for parts that were attached to the post) is also included in the appendix.

4

GCC alleges that the following statements, among others, in Jack's initial post are false and that they were made with malice by Jack and published by both Jack and Karlie:

- Jack's statement that GCC had "zero communication" with Jack and that he "never received a phone call once."

- Jack's statement that GCC was paid $11,000 for parts but only replaced a hood, grill, windshield, and bumper with very little associated hardware.

- Jack's statement that there was more damage from GCC "tearing into" his vehicle than there was done to the vehicle from his collision.

- Jack's statement that nothing was actually replaced inside the truck.

- Jack's statement that GCC's work "diminished the value of [his] truck and it still isn't fixed."

On the same day, Jack gave GCC a 1-star review on the Better Business Bureau (BBB) website and accused GCC of insurance fraud, damaging his truck, and making it unsafe to drive, a post that GCC also alleges is defamatory. For discussion purposes, we will categorize the allegedly defamatory statements and refer to them either as "statements related to GCC's communication with the Thibodeauxes" or "statements related to GCC's repairs to the truck." GCC also alleges that Karlie falsely claimed at least the following:

- GCC was breaking the law by "paying people's deductibles for good reviews. Illegal."

- GCC "did more damage trying to make it look like they replaced things that were never replaced" and committed fraud.

- GCC caused "substantial" "paint damage" from "[o]verspray all over the entire truck."

GCC subsequently responded on its own Facebook page with its perspective on Jack's experience. GCC asserted in its post that Jack was angry because he wanted to pick up his

5

truck and the safety-restraint issue took a few weeks to resolve due to COVID-19 parts delays. GCC said that it was not going to put Jack's family's life at risk in a vehicle with safety issues and that Jack was "a child" who was willing to put his own safety and that of his family at risk, just to have his truck back quickly. GCC's post also disputed Jack's statement that "[o]ut of the 11,000 dollars' worth of parts that Georgetown Collision was paid out for they actually only replaced a hood, grille, windshield and bumper with very little associated hardware." GCC posted photos both of the GEICO estimate approving payment for all aftermarket parts and of GCC's invoices, which GCC asserted showed that all original-equipment manufacturer (OEM) parts were used on the vehicle at no expense to Jack. The invoices included the Thibodeauxes' personal information, including their telephone numbers and home address. After GCC posted the invoices that included the Thibodeauxes' personal information, many people alerted Jack and Karlie to the post and commented on both Jack's page and GCC's page, as well on other public platforms. GCC subsequently deleted the post and its Facebook page.

GCC asserts that it was "forced to remove the GCC Facebook page to mitigate our damages" because after the Thibodeauxes encouraged people to "spread the word" in the comments to Jack's original post, it began to be inundated with negative online ratings and "reviews" from people who had never had any experience with GCC. Specifically, GCC alleges that at least twenty-one friends of the Thibodeauxes posted 1-star ratings and negative reviews of its business on Google and Yelp, although they had no personal experience with GCC, and that others posted negative reviews on GCC's Facebook business page, turning its "hard-earned 5-star reputation to 2-stars overnight."

GCC sued the Thibodeauxes, alleging defamation and business disparagement, based on Jack's Facebook post and comments, Karlie's Facebook re-post of Jack's post and her

6

comments, and their encouragement of others to post negative reviews and comments about GCC. The Thibodeauxes filed answers and TCPA motions to dismiss, and Jack filed counterclaims. GCC subsequently filed an amended petition, adding claims for conspiracy and aiding and abetting. After the trial court granted GCC's motion for limited discovery related to the TCPA motions to dismiss and allowed the Thibodeauxes to file amended TCPA motions to dismiss, GCC filed a supplemental petition to include the review that Jack posted on the BBB website as a supplemental fact, alleging that the review was defamatory and seeking injunctive relief. Although the trial court conducted a hearing on the TCPA motions to dismiss, the motions were overruled by operation of law. *See* Tex. Civ. Prac. & Rem. Code §§ 27.005, .008(a). This appeal followed.

## ANALYSIS

In three issues, the Thibodeauxes assert that the trial court should have granted their motions to dismiss. First, they argue that GCC's business-disparagement claim should have been dismissed because GCC admitted that it had no evidence of special damages, an essential element of its claim. Second, they contend that the trial court should have dismissed GCC's defamation claim, asserting that GCC did not meet its evidentiary burden on several elements of that claim because it failed to show that the challenged statements are objectively verifiable false statements of fact, that the Thibodeauxes negligently made the statements, and that GCC was damaged. In addition, the Thibodeauxes assert they have established that their posts were substantially true. Third, they assert that the trial court should have dismissed GCC's conspiracy and aiding-and-abetting claims because GCC did not present prima facie evidence of wrongful intent or agreement and because they established that 47 U.S.C. § 230(c)(1) bars claims against an Internet user based on content posted by another user.

7

**Legal Framework**

Defamation law has "changed substantially since the early days of the Republic, and this change is 'the direct consequence of the friction between it . . . and the highly cherished right of free speech.'" *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 151 (1967) (quoting *State v. Browne*, 206 A.2d 591, 597 (N.J. App. Div. 1965)). Much of existing defamation law concerns the "tension [that] necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). "[I]n today's world, we must be especially mindful of this longstanding yet delicate balance, as modern technology allows information to be easily and widely disseminated without necessarily being subjected to the sort of rigorous verification processes that conventional media sources are expected to employ." *D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 433 (Tex. 2017). As our sister court has noted when discussing the evolution of defamation law, the Supreme Court has often distinguished between public-figure and private-individual plaintiffs and applied different standards to each because of the "'greater access to the channels of effective communication' that public officials and figures usually have compared with private individuals and the resulting 'more realistic opportunity to counteract false statements,' with the result that '[p]rivate individuals are therefore more vulnerable to injury.'" *Cummins v. Bat World Sanctuary*, No. 02-12-00285-CV, 2015 WL 1641144, at *8 (Tex. App.—Fort Worth Apr. 9, 2015, pet. denied) (mem. op.) (quoting *Gertz*, 418 U.S. at 344). However, as the court pointed out in *Cummins*, this assessment may be less true than it once was, given the widespread use of social media. *Id.* With the advent of the Internet, defamation cases more and more frequently concern the balance between protecting individuals' free speech and the rights of those who may be harmed by that speech. The Texas

Legislature designed the TCPA in part to balance all these competing interests. *See D Mag. Partners*, 529 S.W.3d at 433.

The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d at 584; *see also* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011. The TCPA provides this protection by means of an expedited motion to dismiss a suit that appears to stifle the defendant's communication on a matter of public concern. *In re Lipsky*, 460 S.W.3d at 584 (citing Tex. Civ. Prac. & Rem. Code § 27.003). Review of an order on a TCPA motion to dismiss requires a three-step analysis. *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018). Under the first step, the party moving for dismissal must demonstrate that the TCPA applies to the legal action that is the subject of the motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code §§ 27.003(a), .005(b). If the movant satisfies that burden, under the second step, the burden shifts to the nonmovant to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Finally, under the third step, if the TCPA applies and the nonmovant satisfies its burden of presenting a prima facie case, the burden shifts back to the movant to establish as a matter of law each essential element of a valid defense to the nonmovant's claim. *Id.* § 27.005(d).

When determining whether a legal action should be dismissed under the TCPA, courts must consider "the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a). We view the pleadings, affidavits, and evidence in the light most favorable to the nonmovant. *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 801 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020). We review de novo the trial court's

ruling on a motion to dismiss, including whether the parties have carried their respective burdens. *Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 873 (Tex. App.—Austin 2018, pet. denied).

GCC does not dispute that its claims are subject to the TCPA. Accordingly, the only issues before us are whether GCC has established by clear and specific evidence a prima facie case on each element of its claims for business disparagement, defamation, conspiracy, and aiding and abetting and, if so, whether the Thibodeauxes have established as a matter of law their affirmative defenses.

A "prima facie case" "refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d at 590 (citing *Simonds v. Stanolind Oil & Gas Co.*, 136 S.W.2d 207, 209 (Tex. [Comm'n Op.] 1940)). "It is the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (per curiam)). In addition, the TCPA limits the type of evidence from which a prima facie case may be made to that evidence which is "clear and specific"—"clear" meaning "unambiguous," "sure or free from doubt," and "specific" meaning "'explicit' or 'referring to a particular named thing.'" *Id.* Thus, the term "'clear and specific evidence' refers to the quality of evidence required to establish a prima facie case, while the term 'prima facie case' refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden." *Serafine v. Blunt*, 466 S.W.3d 352, 358 (Tex. App.—Austin 2015, no pet.).

The supreme court has concluded that the "clear and specific" evidentiary standard does not exclude circumstantial evidence from consideration. *In re Lipsky*, 460 S.W.3d at 589. Circumstantial evidence is "indirect evidence that creates an inference to establish a central fact," and "[i]t is admissible unless the connection between the fact and the inference is too weak to be

of help in deciding the case." *Id.* In some cases, the determination of certain facts "may exclusively depend on such evidence." *Id.*; *see, e.g.*, *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002) (considering defamation claim and noting that claims involving proof of defendant's state of mind "must usually [ ] be proved by circumstantial evidence"). Conclusory statements and bare, baseless opinions are not probative and accordingly do not establish a prima facie case. *Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion*, 517 S.W.3d 212, 222 (Tex. App.—Austin 2017, no pet.) (citing *In re Lipsky*, 460 S.W.3d at 592-93; *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 355 (Tex. App.—Houston [1st Dist.] 2013, pet. denied)). "Collectively, these elements require that a party 'provide enough detail to show the factual basis for its claim,' and thus effectively abrogate the utility of mere notice pleading as 'evidence' to that end." *Cavin v. Abbott*, 545 S.W.3d 47, 72 (Tex. App.—Austin 2017, no pet.) (quoting *In re Lipsky*, 460 S.W.3d at 590-91). If the nonmovant provides evidence that establishes a prima facie case if left uncontradicted and unexplained, the prima facie case is rebutted only "when the true facts are conclusively shown by other evidence." *Warner Bros. Entm't, Inc.*, 538 S.W.3d at 801 (quoting *Simonds*, 136 S.W.2d at 209). With this framework in mind, we turn to the analysis of whether the parties have carried their respective TCPA burdens.

## I.      GCC's business-disparagement claim

The Thibodeauxes contend that the trial court should have dismissed GCC's business-disparagement claim because GCC failed to present evidence on the essential element of special damages. *See Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (explaining that essential elements of plaintiff's business-disparagement claim are that "(1) the defendant published false and disparaging information about it, (2) with malice, (3) without

privilege, (4) that resulted in special damages to the plaintiff"). On the record at the TCPA hearing, GCC essentially abandoned this claim, stating "[w]e grant, we don't have specific damages. We are—we're dismissing that claim, the business disparagement claim." *See* Tex. R. Civ. P. 165 ("A party who abandons any part of his claim or defense, as contained in the pleadings, may have that fact entered of record, so as to show that the matters therein were not tried."); *see also FKM P'ship, Ltd. v. Board of Regents of Univ. of Houston Sys.*, 255 S.W.3d 619, 632 (Tex. 2008) (noting that voluntary dismissal of claim is effective when announced in open court or amended petition omitting claim is filed). GCC did not respond to the Thibodeauxes' argument on this claim. We agree with the Thibodeauxes that even though GCC orally dismissed its business-disparagement claim, the claim was still subject to TCPA dismissal, mandatory fee-shifting, and permissive sanctions. *See, e.g.*, *Craig v. Tejas Promotions, LLC*, 550 S.W.3d 287, 293-97 (Tex. App.—Austin 2018, pet. denied) (holding that nonmovant's amendment of its petition to abandon claim after TCPA motion was filed did not moot TCPA motion because claims for affirmative relief of attorneys' fees and sanctions remained and concluding that trial court erred by not granting TCPA motion as to abandoned claim when nonmovant failed to present prima facie case as to each element of its claim). We conclude that the trial court erred by not dismissing GCC's business-disparagement claim because GCC admittedly could not establish a prima facie case on the claim's damages element. Accordingly, we sustain the Thibodeauxes' first issue and reverse in part and render judgment granting the Thibodeauxes' motions to dismiss as to this claim. Because the issues of attorneys' fees and sanctions under the TCPA remain, we will remand the cause to the trial court for further proceedings on those issues consistent with this opinion and the TCPA. *See id.* at *13.

## II.  GCC's defamation claim

To establish the elements of a defamation claim in this case, GCC must show that the Thibodeauxes: (1) published a false statement of fact to a third party; (2) that defamed GCC; (3) while acting with negligence (because GCC is a private business) regarding the truth of the statement; and (4) the statement caused damages, unless the statement constitutes defamation per se.  *See In re Lipsky*, 460 S.W.3d at 593; *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).  The common law and statutes provide certain defenses and privileges to defamation claims, including the defense of truth.  *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013) (citing Tex. Civ. Prac. & Rem. Code § 73.005), *superseded by statute on other grounds by Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 791 (Tex. 2019).  The Thibodeauxes contend that the trial court should have dismissed GCC's defamation claims against them because (1) the gist of their posts is a "subjective account" of their experience with GCC and therefore cannot be objectively verifiable statements of fact; (2) GCC failed to show that the Thibodeauxes acted negligently, that is, that they knew or should have known their statements were false; and (3) GCC failed to meet its burden to establish damages.

"In a defamation case, the threshold question is whether the words used 'are reasonably capable of a defamatory meaning.'"  *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) (quoting *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)).  In conducting this inquiry, which is a question of law, we construe the statement "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive" the entire statement, not merely the publication's

13

individual statements considered in isolation.[3] *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000) (citing *Musser*, 723 S.W.2d at 655); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) ("[P]ublications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself."). A "person of ordinary intelligence" is one who "exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004) (noting that this "inquiry is objective, not subjective").

There are two independent steps to this inquiry. First, we must determine whether the meaning GCC alleges is reasonably capable of arising from the text of which it complains. *See Tatum*, 554 S.W.3d at 625. Second, if the meaning is reasonably capable of arising from the text, we must determine whether the meaning is reasonably capable of defaming GCC. *See id.*; *see also, e.g.*, *D Mag. Partners*, 529 S.W.3d at 437-41 (first analyzing article's gist, then discussing whether gist was defamatory). The Texas Supreme Court has reaffirmed in several recent cases the importance of assessing a publication's gist in evaluating a defamation claim. *See, e.g.*, *D Mag. Partners*, 529 S.W.3d at 434 (citing *Neely*, 418 S.W.3d at 63-64). A publication "with specific statements that err in the details but that correctly convey the gist of a story is substantially true." *Neely*, 418 S.W.3d at 63-64 (citing *Turner*, 38 S.W.3d at 115). Conversely, even if all the publication's individual statements are literally true, the publication "can convey a false or

---

[3] However, if the court determines the language is ambiguous, then the jury should determine the statement's meaning. *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987).

defamatory meaning by omitting or juxtaposing facts." *Id.* at 64 (quoting *Turner*, 38 S.W.3d at 114).

**A. The gist of the Thibodeauxes' posts is defamatory, and the defamatory gist is created by actionable statements of fact, not only statements of opinion**

The Thibodeauxes argue that GCC failed to address the challenged posts in their entirety and in the context of social media. They assert that "[s]ocial media is an inartful place, where consumers praise and criticize businesses with colorful language, exaggeration, and rhetoric," and in that context, most consumer reviews, including those of the Thibodeauxes, are merely subjective and opinionated in nature. In response, GCC contends that the gist of the Thibodeauxes' statements defamed GCC's fitness and abilities as a collision-repair center.

As noted above, GCC alleges that Jack made false defamatory statements both about GCC's communications with him and about GCC's repair of his truck. In this case, even if some of the Thibodeauxes' statements in isolation may not be actionable, viewing the posts in their entirety, the gist of the statements in Jack's original Facebook post, his post on the BBB website, and Karlie's Facebook comments is that GCC committed insurance fraud by receiving payment from GEICO for $11,000 in parts it never put on Jack's truck, acted illegally by waiving its customers' deductibles in exchange for positive reviews, and did more damage to his truck than was caused by his collision. *See, e.g.*, *In re Lipsky*, 460 S.W.3d at 594 (analyzing gist of publications as whole). Under the first step of the gist inquiry, we conclude that the alleged gist disparaging GCC's fitness and abilities as a collision-repair center is reasonably capable of arising from the text of which GCC complains. *See Tatum*, 554 S.W.3d at 625; *see also, e.g.*, *D Mag. Partners*, 529 S.W.3d at 437-41 (first analyzing article's gist, then discussing whether gist was defamatory).

15

In the second step of the gist inquiry, to determine whether the meaning is reasonably capable of defaming GCC, we consider whether the statements are actionable defamatory statements. To be actionable, a statement must assert an objectively verifiable fact. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19 (1990) (explaining that "a statement on matters of public concern must be provable as false," at least when media defendant is involved, but noting question is unresolved in cases involving nonmedia defendants); *Bentley v. Bunton*, 94 S.W.3d 561, 580 (Tex. 2002). For purposes of this analysis, we will assume without deciding that GCC, as a private plaintiff suing private non-media defendants, must establish that the defamatory statements are objectively verifiable statements of fact. Expressing a defamatory statement in the form of an "opinion" does not necessarily shield the statement from tort liability because an opinion may expressly or impliedly assert facts that can be objectively verified. *Backes v. Misko*, 486 S.W.3d 7, 24 (Tex. App.—Dallas 2015, pet. denied) (citing *Avila v. Larrea*, 394 S.W.3d 646, 658 (Tex. App.—Dallas 2012, pet. denied)). We focus our analysis on the verifiability of the statement and the entire context in which the statement is made. *Bentley*, 94 S.W.3d at 581. Whether a statement is an actionable statement of fact or a constitutionally protected opinion is a question of law. *Id.* at 580.

The Thibodeauxes contend that because their comments were made in the context of a public Facebook comment thread where they and other users were sharing their experiences with GCC and also on the BBB website where consumers regularly criticize businesses, the statements are not actionable because they are "mere consumer opinion." They further argue that an ordinary reader would see their reviews, using hyperbole such as "zero communication," "absolute worst customer service," "so unhappy with the condition of my truck," and "fraudulent,"

16

as no different from subjective non-actionable opinions complaining about the food at a local restaurant or poor service from a bank.

Even though some of the Thibodeauxes' statements, in isolation, are statements of opinion, some of the statements that contribute to the defamatory gist of their posts are verifiable statements of fact. Their statements asserting that GCC engaged in insurance fraud by receiving payment for parts that it did not replace are verifiable statements of fact.[4] We conclude that these statements were "sufficiently factual to be susceptible of being proved true or false," *Milkovich*, 497 U.S. at 21, and thus, GCC has met its burden of showing that the allegedly defamatory statements are verifiable statements of fact. *See In re Lipsky*, 460 S.W.3d at 595 (concluding nonmovant had provided sufficient evidence of defamatory factual statements to satisfy TCPA burden); *see also Tatum*, 554 S.W.3d at 632 (explaining that "if a court determines that a statement is capable of defamatory meaning and *only* defamatory meaning—that it is unambiguous—then the jury plays no role in determining the statement's meaning").

**B.      GCC presented sufficient evidence to meet its TCPA burden on negligence**

The Thibodeauxes contend that because GCC is a private entity, not a public official or public figure, it must show that the Thibodeauxes acted with negligence regarding the truth of their statements. *See WFAA-TV, Inc.*, 978 S.W.2d at 571 (explaining that private plaintiffs must prove that media defendants acted with at least negligence in publishing or broadcasting defamatory statements); *see also Neely*, 418 S.W.3d at 72 ("For the purposes of defamation

---

[4] Because we have determined that the Thibodeauxes' statements alleging that GCC committed insurance fraud are objectively verifiable statements of fact, we need not decide at this preliminary stage of the case whether any of their other disparaging and allegedly defamatory statements are also verifiable statements of fact.

17

liability, a broadcaster is negligent if she knew or should have known a defamatory statement was false."); *Van Der Linden v. Khan*, 535 S.W.3d 179, 200 (Tex. App.—Fort Worth 2017, pet. denied) (requiring TCPA nonmovant to establish prima facie case that movant acted negligently in defamation case between private-figure plaintiffs). The Thibodeauxes contend that GCC has only provided conclusory allegations that they knew or should have known that their statements were false.

GCC points to both direct and circumstantial evidence that is clear and specific to support a prima facie case that the Thibodeauxes knew or should have known of the falsity of their statements. *See In re Lipsky*, 460 S.W.3d at 589 (noting that "the determination of certain facts in particular cases may exclusively depend on such [circumstantial] evidence"); *see also, e.g.*, *Bentley*, 94 S.W.3d at 596 (noting that claims involving element of defendant's state of mind "must usually [ ] be proved by circumstantial evidence"). Jack asserted in his Facebook post that after picking up the truck, he had "since taken my vehicle to Don Hewlett collision center (Geico Approved and reputable) for them to review the work and look over my estimate. Out of the 11,000 dollars worth of parts that Georgetown Collision was paid out for they actually only replaced a hood, grille, windshield and bumper with very little associated hardware." Although Jack attested that the Don Hewlett representative told him this when he took the truck there the day after he picked it up from GCC, the evidence in the record, including email correspondence between GEICO and Don Hewlett, does not show that Don Hewlett ever told GEICO that GCC had charged GEICO for parts that it had not replaced. Moreover, the circumstantial evidence suggests that Don Hewlett had not yet done an internal inspection of the truck when Jack made his initial post and thus would not have told the Thibodeauxes that only those large, visible parts had been replaced because when Don Hewlett subsequently (on May 22) requested approval to do

18

additional work, none of the additional work involved replacing parts that GCC had previously been paid for. For the same reasons, Karlie lacked any basis for her statement that "they did more damage trying to make it look like they replaced things that were never replaced. Fraudulent." Furthermore, although GCC posted the invoices (which showed that GCC purchased over 50 parts to replace on the vehicle) in response to Jack's post and other Facebook users sent them to the Thibodeauxes, the Thibodeauxes did not retract their allegations after seeing the invoices. Instead, they assert that the invoices do not prove that the parts were actually used in the repair of the truck. Leaving aside the fact that none of the evidence in the record, including the Thibodeauxes' third-party inspection reports, suggests that GCC did not actually use these parts in the repair of Jack's truck, the Thibodeauxes' assertion that at the time of Jack's post they had not seen the invoices does not support their argument that they should not have known that their statements about insurance fraud were false—on the contrary, it is further indication that they had no factual basis for their statements. If they did not know what parts were supposed to have been replaced, they had no basis for saying those parts were not replaced. Based on the evidence in the record, we conclude that GCC met its burden to establish a prima facie case that the Thibodeauxes negligently made the challenged defamatory statements.

**C.     The Thibodeauxes' statements constitute defamation per se, and as a result, damages are not an element for which GCC must establish a prima facie case**

The Thibodeauxes assert that GCC failed to provide any evidence of actual damages. GCC responds that it was not required to establish the element of damages because the challenged statements were defamatory per se, and thus nominal damages may be presumed.[5] *See*

---

[5] In *Hancock v. Variyam*, the supreme court explained that "there are three types of damages that may be at issue in defamation *per se* proceedings: (1) nominal damages; (2) actual

19

*In re Lipsky*, 460 S.W.3d at 593, 596. The Thibodeauxes counter that the statements are not defamatory per se, and they further contend that even if the statements constitute defamation per se, the First Amendment nevertheless requires GCC to provide proof of actual damage.

Texas recognizes the common-law rule that defamation is either per se or per quod. *Tatum*, 554 S.W.3d at 624 (citing *In re Lipsky*, 460 S.W.3d at 596). Defamation per se refers to statements that are so obviously harmful to a person's reputation that a jury may presume general damages, such as damages for loss of reputation or for mental anguish. *Hancock v. Variyam*, 400 S.W.3d 59, 63-64 & n.4 (Tex. 2013) (noting that actual or compensatory damages include both general damages, which are noneconomic in nature, and special damages, which are economic, such as damages for lost income). Statements that injure a person in his office, profession, or occupation are typically classified as defamatory per se, *id.* at 64, 66, as are statements accusing someone of a crime, *In re Lipsky*, 460 S.W.3d at 596. Defamation per quod is simply defamation that is not actionable per se. *Id.* Whether a statement qualifies as defamation per se is generally a question of law. *Id.*

---

or compensatory damages; and (3) exemplary damages." 400 S.W.3d 59, 65 (Tex. 2013) (citing Restatement (Second) of Torts § 907 cmt. a (Am. Law. Inst. 1979)). The court further explained that if a statement is defamatory per quod but not per se, a plaintiff may potentially recover only actual and exemplary damages. *Id.* Nominal damages are awarded only in defamation per se cases, when "there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation" or "when they are the only damages claimed, and the action is brought for the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory matter." *Id.* (quoting Restatement (Second) of Torts § 620 cmt. a (Am. Law. Inst. 1977)). Nominal damages "are a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages." *Id.* (quoting Restatement (Second) of Torts § 907 (Am. Law. Inst. 1979)). Nominal damages are defined as a "trifling sum," such as $1. *Id.* Actual or compensatory damages are intended to compensate a plaintiff for its injury. *Id.* They include general damages, which are noneconomic damages like loss of reputation or mental anguish, and special damages, which are economic damages like lost income. *Id.*

The Thibodeauxes' statements are defamatory per se—the gist of the statements is that GCC committed insurance fraud by not replacing the parts GEICO paid for, that it acted illegally by waiving its customers' deductibles in exchange for positive reviews, and that the truck was more damaged after GCC worked on it than when the Thibodeauxes brought it in for repair. These are statements accusing GCC of a crime, *see id.*, as well as statements "that injure a person in his office, profession, or occupation," *Hancock*, 400 S.W.3d at 64, 66, i.e., the types of statements that are typically classified as defamatory per se. These accusations directly impugn GCC's fitness and abilities as a collision-repair center. *See In re Lipsky*, 460 S.W.3d at 596. Although the Thibodeauxes urge that the challenged statements only portray GCC with general characteristics like dishonesty, we disagree. The challenged statements are "[r]emarks that adversely reflect on a person's fitness to conduct his or her business or trade" and thus are defamatory per se. *See id.*

When statements are defamatory per se, they are so obviously harmful that general damages may be presumed. *Id.* at 593 (citing *Hancock*, 400 S.W.3d at 63-64.). However, while "Texas law presumes general damages when the defamation is per se, it does not 'presume any particular amount of damages beyond nominal damages.'" *Id.* (quoting *Salinas v. Salinas*, 365 S.W.3d 318, 320 (Tex. 2012) (per curiam)). Thus, when a jury awards general damages that exceed a nominal sum, the award must be reviewed for evidentiary support. *Id.* In *In re Lipsky*, a TCPA case, the Texas Supreme Court concluded that "[p]leading and proof of particular damage is not required to prevail on a claim of defamation per se, and thus actual damage is not an essential element of the claim to which the TCPA's burden of clear and specific evidence might apply." *Id.* at 596 (holding that while plaintiff's affidavit on damages may have been insufficient to substantiate its claim to special damages, it was not needed to defeat defendant's dismissal motion

21

because plaintiff's defamation claim was actionable per se); *see also D Mag. Partners*, 529 S.W.3d at 434, 439 (holding that plaintiff need not show actual damages to survive TCPA motion to dismiss because article's gist could be construed to accuse her of committing crime, which is defamatory per se); *see also Brady v. Klentzman*, 515 S.W.3d 878, 886 n.3 (Tex. 2017) (noting that no question remains after *In re Lipsky* that nominal damages may be presumed without evidence of actual injury and explaining that presumption does not conflict with U.S. Supreme Court's decision in *Gertz* because nominal damages pose no threat of chilling free expression).

Despite this clear guidance from the Texas Supreme Court, the Thibodeauxes argue that nominal damages may not be presumed in this case unless GCC establishes that their statements were made with actual malice, and they urge us to follow our sister court's opinion in *MacFarland v. Le-Vel Brands LLC*, No. 05-16-00672-CV, 2017 WL 1089684 (Tex. App.—Dallas, Mar. 23, 2017, no pet.) (mem. op.). In *MacFarland*, the Dallas Court of Appeals concluded, based on its analysis of Supreme Court and Texas Supreme Court defamation cases, that "(1) general damages may be presumed in defamation per se cases only when the speech is not public or the plaintiff proves actual malice and (2) such presumed damages are limited to nominal damages."[6] *Id.* at *15. Although *MacFarland* was also a TCPA case, it relied on *Hancock*, 400 S.W.3d at 65-66, a non-TCPA Texas Supreme Court case, to support its holding that a defamation plaintiff had not satisfied its TCPA burden on the damages element of its claim. *See* 2017 WL 1089684, at *14. In *Hancock*, which was an appeal from a jury verdict awarding actual damages for mental anguish and loss of reputation and exemplary damages, the supreme court considered whether the

---

[6] It is undisputed in this case that the Thibodeauxes' statements related to a matter of public concern. *See* Tex. Civ. Prac. & Rem. Code § 27.001(3), (7) (defining "exercise of the right of free speech" and "matter of public concern").

statements at issue constituted defamation per se, and because it concluded they were not, whether the evidence supported the award of actual damages. 400 S.W.3d 59 at 63, 66. The Texas Supreme Court extrapolated the effect of the Supreme Court's holdings in two defamation cases and stated as follows:

> Historically in Texas, defamation per se claims allow the jury to presume the existence of general damages without proof of actual injury. But the First Amendment requires competent evidence to support an award of actual or compensatory damages when the speech is public or the level of fault is less than actual malice. *See Time Inc. v. Firestone*, 424 U.S. 448, 459 (1976); *Gertz*, 418 U.S. at 349-50. Thus, the Constitution only allows juries to presume the existence of general damages in defamation *per se* cases where: (1) the speech is not public, or (2) the plaintiff proves actual malice. *See Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985); *Gertz*, 418 U.S. at 349-50.

*Id.* at 65-66 (complete citations included where needed). The court in *MacFarland* declined to follow the Texas Supreme Court's guidance in *In re Lipsky*, finding it not instructive because the court "(1) did not address whether the speech in question was public or private and (2) specifically stated in its analysis that it was addressing whether Range had shown evidence of 'special damages.'" 2017 WL 1089684, at *15. Although it also noted the supreme court's guidance in *Brady* and *D Magazine Partners*, the *MacFarland* court nevertheless concluded that it would follow what it determined to be the court's guidance in *Hancock* requiring a plaintiff to show that the speech at issue either was not related to a public concern or was made with actual malice. However, *Hancock* and the Supreme Court cases it analyzed did not consider or resolve the question of whether nominal damages may be presumed in defamation per se cases. *See Brady*, 515 S.W.3d at 886 n.3 (noting *In re Lipsky* resolved question left open in *Hancock*). On the other hand, *In re Lipsky* and the cases following it specifically addressed the question. We do not find persuasive *MacFarland*'s purported distinctions that the court in *In re Lipsky* was analyzing

23

evidence of special damages, which are a component of actual damages, or that it did not state

whether the speech was public—it was a TCPA case, and as the court pointed out, the TCPA

"protects citizens who petition or *speak on matters of public concern* from retaliatory lawsuits that

seek to intimidate or silence them," *In re Lipsky*, 460 S.W.3d at 584 (emphasis added). Under the

*MacFarland* analysis, a defamation plaintiff would always have to establish either actual damages

or actual malice at the preliminary TCPA stage of the case. We believe that is an incorrect reading

of the law under binding Texas Supreme Court precedent, and we decline to follow it. Because

we have concluded that the Thibodeauxes' challenged statements are defamatory per se, we hold

that GCC was not required to show actual damage as an essential element of its defamation claim.[7]

D.     **The Thibodeauxes failed to establish their affirmative defense of truth as a matter of law**

The Thibodeauxes contend that even if we determine that GCC met its burden to

establish a prima facie case on each element of its defamation claim, the trial court erred by not

dismissing the claim because they established the truth of the posts as a matter of law. *See* Tex.

Civ. Prac. & Rem. Code § 27.005(d) (providing that even if nonmovant establishes prima facie

---

[7] The Thibodeauxes also assert that GCC did not meet its TCPA burden to establish its entitlement to exemplary damages. Exemplary damages are a remedy, not a claim. The heightened standards of proof that a party must satisfy to recover exemplary damages do not alter the elements of GCC's underlying defamation per se claim. *See Van Der Linden v. Khan*, 535 S.W.3d 179, 202 (Tex. App.—Fort Worth 2017, pet. denied) ("[T]he TCPA applies to the dismissal of causes of action, not remedies, and while obtaining an award of exemplary damages might require further proof at trial, the elements [the plaintiff] must prove to recover general damages under his legal action for defamation/defamation per se remain unchanged."); *see also Cavin v. Abbott*, 613 S.W.3d 168, 171-72 (Tex. App.—Austin 2020, pet. denied) (holding that request for injunctive relief is not "legal action" as defined by TCPA and thus cannot be challenged separately from underlying assault claim upon which it depends and which is exempt from TCPA). Accordingly, we conclude GCC's pleading for exemplary damages does not require it to establish these heightened standards of proof to avoid dismissal of its defamation claim on a TCPA motion.

24

case, trial court shall dismiss legal action against movant "if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law"). In response, GCC contends that a number of the Thibodeauxes' challenged statements are demonstrably false, and at a minimum, they have failed to meet their burden.

In suits brought by private individuals, truth is an affirmative defense to a defamation claim. *Randall's Food Mkts. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995); *see also* Tex. Civ. Prac. & Rem. Code § 73.005(a); *Neely*, 418 S.W.3d at 62 (citing *Turner*, 38 S.W.3d at 115); *Cummins*, 2015 WL 1641144, at *8 (explaining that Supreme Court has not yet answered question of when, if ever, private-figure plaintiff suing nonmedia defendant has burden of proving that defamatory statement is false and noting Texas Supreme Court has thus far not abrogated common-law rule that truth is defense in cases in which defendant is not member of media and statements are not on matter of public concern). In cases involving media defendants, the defense of truth requires that the statements be substantially true. *Neely*, 418 S.W.3d at 62. For purposes of our analysis, we assume without deciding that the same standard applies in suits between private plaintiffs and private defendants in which the challenged statements are related to a matter of public concern.

In the media-broadcast context, "[t]he test for whether a report like [defendant's] is substantially true is whether the 'broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been.'" *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016). This analysis requires us to determine "the import of the broadcast as a whole—its gist to the ordinary listener—and compar[e] it to a truthful report." *Id.* As explained above, the gist of the Thibodeauxes' posts is that GCC committed insurance fraud by receiving payment from GEICO for $11,000 in parts it never put on Jack's truck, acted illegally

25

by waiving its customers' deductibles in exchange for positive reviews, and did more damage to his truck than was caused by his collision. The Thibodeauxes have not established as a matter of law that GCC failed to install any parts on Jack's truck that it was paid for, that it acted illegally by waiving customers' deductibles in exchange for online reviews, or that more damage was done to the truck by GCC's repair work than by Jack's collision. Accordingly, we conclude that the Thibodeauxes have not satisfied their burden under the TCPA to establish that the gist of their posts is substantially true and not more damaging than the absolute truth would be.

Having concluded that GCC established a prima facie case on the essential elements of its defamation per se claim and that the Thibodeauxes did not establish as a matter of law the defense of truth, we overrule the Thibodeauxes' second issue.

### III. GCC's participatory-liability claims

In addition to its defamation claim, GCC alleged that the Thibodeauxes and others conspired to post numerous and specifically identified allegedly false and defamatory reviews reiterating the Thibodeauxes' claims and that the Thibodeauxes encouraged and assisted those other people in posting and republishing the allegedly false and defamatory reviews. The Thibodeauxes contend that the trial court erred by failing to dismiss GCC's claims for conspiracy and aiding and abetting, asserting that GCC failed to establish a prima facie case on the essential elements of these claims. We have previously held that when TCPA movants seek on appeal to dismiss a conspiracy claim that is derivative of a defamation claim, we need not analyze separately whether the nonmovant established a prima facie case on the conspiracy claim. *Warner Bros. Entm't, Inc.*, 538 S.W.3d at 814 (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding), for proposition that "courts 'do not analyze the trial court's refusal to dismiss

26

plaintiffs' causes of action for conspiracy separately from its refusal to dismiss their other causes of action'" because conspiracy is a derivative tort).

Although the Thibodeauxes assert that this Court in two other cases has applied the TCPA's requirement that a nonmovant make a prima facie showing to conspiracy claims, both of those cases were in a different procedural posture. In *Neurodiagnostic Consultants, LLC v. Nallia*, we were considering an appeal from a trial court's order *granting* the defendants' TCPA motion to dismiss, not an appeal from a denial of a TCPA motion to dismiss. No. 03-18-00609-CV, 2019 WL 4231232, at *1 (Tex. App.—Austin Sept. 6, 2019, no pet.) (mem. op.). In that case, after this Court determined that the nonmovant plaintiff had established a prima facie case on its tort claims underlying the conspiracy claim, we then considered whether the conspiracy claim also should not have been dismissed, and we held that the nonmovant had also established a prima facie case on each element of its conspiracy claim. *Id.* at *10. That is, because we determined the tort claims were wrongly dismissed from the case, we had to consider whether the derivative claim was also wrongly dismissed. Similarly, in *Craig v. Tejas Promotions, LLC*, although that case involved an appeal from a denial of a TCPA motion to dismiss, the Court considered whether the nonmovant appellee had established a prima facie case on each element of its nonsuited conspiracy claim because, as we noted earlier, nonsuiting a claim does not moot the claim for purposes of pursuing attorneys' fees and sanctions under the TCPA. 550 S.W.3d at 293-94. In other words, in *Craig*, the Court had to separately consider whether the nonmovant appellee had established a prima facie case on the conspiracy claim (even though appellants had not challenged any of the underlying tort claims through a timely TCPA motion and thus those related tort claims remained part of the case) because the nonmovant appellee could not escape potential TCPA liability for attorneys' fees and sanctions by nonsuiting its conspiracy claim. *Id.* Thus, due to the different

27

procedural posture of those cases, they do not change our prior assessment that in a case like the one currently before us, when we determine that the trial court did not err by refusing to dismiss the defamation claim that the conspiracy claim depends on, we need not analyze separately whether the trial court erred by refusing to dismiss the derivative claims. Accordingly, we conclude that the trial court did not err by refusing to dismiss GCC's conspiracy claim or its aiding-and-abetting claim, claims that are dependent on its defamation claim.[8] *See Warner Bros. Entm't, Inc.*, 538 S.W.3d at 814.

To the extent that the Thibodeauxes assert that 47 U.S.C. § 230 bars GCC's participatory-liability claims as a matter of law, we need not address this defensive claim because, as stated above, we are not analyzing whether GCC established a prima facie case on the elements of these claims and thus do not reach the third step of the TCPA analysis. *See* Tex. R. App. P. 47.1. However, were we to address it, we could not conclude that the Thibodeauxes have met their burden to establish its applicability in this case as a matter of law. The Thibodeauxes' argument is based on a misreading of GCC's allegations. They contend that Section 230 bars GCC's participatory-liability claims, asserting that GCC seeks to hold them liable for what others have said about GCC online. *See* 47 U.S.C. § 230(c)(1) (stating "[n]o provider or user of an interactive

---

[8] The Thibodeauxes also argue that aiding and abetting has not been expressly recognized by the Texas Supreme Court as a cause of action, *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017), and that we should decline to recognize it in this case. This Court has previously declined to recognize an aiding-and-abetting claim in the absence of recognition of such a claim by the Texas Supreme Court or the Legislature, *Hampton v. Equity Tr. Co.*, 607 S.W.3d 1, 4-5 (Tex. App.—Austin 2020, pet. denied), and we need not reach the issue of the claim's existence now, *see* Tex. R. App. P. 47.1. Even when the supreme court has assumed without deciding that such a cause of action existed, it analyzed whether "the defendant, with wrongful intent, substantially assisted and encouraged a tortfeasor in a wrongful act that harmed the plaintiff," making this claim, like conspiracy, derivative of the underlying tort claim. *First United Pentecostal*, 514 S.W.3d at 225.

computer service shall be treated as the publisher or speaker of any information provided by another information content provider"). However, the focus of GCC's participatory-liability claims, as noted in its appellate brief, is its allegation that the Thibodeauxes conspired with others, or encouraged and assisted them, to engage "in *the act itself* of posting a negative review when that person *had absolutely no experience with GCC and no firsthand knowledge of GCC*." That is, GCC alleges that the Thibodeauxes encouraged others to disseminate in their own words defamatory information about GCC, not that the Thibodeauxes should be treated as the speaker or publisher of independent defamatory content potentially created by those other users. Thus, the Thibodeauxes cannot show as a matter of law that Section 230(c)(1) would bar GCC's participatory-liability claims.

Because the trial court did not err by refusing to dismiss GCC's participatory-liability claims, we overrule the Thibodeauxes' third issue.

## CONCLUSION

Having sustained the Thibodeauxes' first issue, we reverse the trial court's failure to dismiss GCC's business-disparagement claim. We render judgment dismissing the claim and remand the case to the trial court for further proceedings on attorneys' fees and possible sanctions consistent with this opinion. Having overruled the Thibodeauxes' other two issues, we affirm the trial court's refusal to dismiss the defamation and participatory-liability claims.

_____

Gisela D. Triana, Justice

29

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed in part; Reversed and Rendered in part; Remanded

Filed:   October 22, 2021

# APPENDIX



**Exhibit A**

Jack Tanner Thibodeaux is with Karlie Ann Thibodeaux.
May 15 at 2:42 PM ·

I apologize for the lengthy post but this could help you or your friends and family.

DO NOT TAKE YOUR VEHICLE TO GEORGETOWN COLLISION! I got into a minor accident because i slid off the road attempting to dodge a deer. Instead i hit a sign. I dropped my vehicle off with Georgetown collision on the 16th of March. Only to pick it up May 13th in almost worse shape than it was in. This place has the absolute worst customer service i have ever dealt with. Zero communication and will not attempt to answer your questions or update you. Originally my vehicle was estimated to be completed on March 26th and the cost of repairs was 5 grand. Then coronavirus happened and the adjusters for Geico were no longer able to go to the truck in person.

After the body shop pulled my truck apart they re evaluated the costs at 16k worth of damage and my new expected completion date April 16th. This date then changed multiple times and I never received a phone call once. I called Georgetown Collision to get an update and they told me that my truck would be ready the same day or next day multiple times in between. After the shop telling me multiple times that my truck was going to be ready they finally had a real date and time for pick up, may 1st at 330pm. I called to verify two hours prior and upon pickup my vehicle was not ready and they would not release it to me due to a seatbelt code on the dash and that being a safety concern. I was told a couple more days and I'd have it back. They just needed to get parts local to replace my seatbelts and the module to go with. Not once did I receive a phone call from them during the following week but I called the shop to ask how it was going and when I could expect to pick up. The parts came in and were Installed and they just needed to get someone to program the new module. This now put the damage at 18 thousand dollars!!

Friday, May 8th comes around and I was told that my vehicle was not ready and that someone that works for a shop was going to pick up it up from Georgetown Collision to clear the codes etc over the weekend. I was not okay with this and asked that my vehicle be sent to a dealership. They insisted that this guy was certified and my truck would be ready to go on Monday. I asked to speak to the owner Scott Starkes and I told him that I wanted to pick up my truck and I wasn't comfortable with some random person taking my truck for the weekend. He asked me if I was some kind of stupid and told me that there was no way I was picking up my truck, whether I drove it off the lot or had it towed. Williamson county was informed, since i was told I'd be charged with trespassing for going to the shop, and they claimed that they had no leverage and that I should just wait to have the codes cleared and that the shop promised it would be completed Monday the 11th. Since that Monday when I called to ask the status of my truck I was hung up on multiple times. When I did finally talk to someone I was told that the guy who took my vehicle still had it but was unable to fix it and that don hewlett in Georgetown would have it. For the next couple of days I called service and collision departments at Don Hewlett, they had not seen my truck and said there was nothing ever in their system matching my VIN. I called Georgetown Collision to ask where my truck was and they insisted it was at Don Hewlett and when I informed them that Don Hewlett did not have it I was hung up on and they would no longer take my calls. I reported my truck stolen through Onstar in an attempt to find it and the authorities said that it was a civil dispute and they could not help me. The morning of May 13th I got a call from Nyle Maxwell GMC in Round Rock saying that my truck was ready for pick up. I thought about going to pick it up from there but instead informed Georgetown collision to avoid problems. They sent someone to get my vehicle and said I could pick it up after it was detailed. I arrived at Georgetown Collision at 4pm and waited until 530pm for them to finish detailing my truck. I was so unhappy with the condition of my truck. I over heard the owner say he didn't want to deal with me to avoid conflict and I was told that their printer was broken so I wouldn't receive any paperwork. I was sent on my way with my truck in terrible condition and it all set in when I turned the corner out of their lot and glass slid through my dash and landed in my lap. Not sure how that is any safer than a seatbelt code.

Please avoid this place. The insurance companies can not legally inform you about a company if you request it. This place is advertised all over Austin and is known for replacing your damaged parts with only OEM parts and paying your deductible. I have discovered that they pay your deductible and if you do not give them good reviews online they will then charge your deductible. I don't know how this place is even in business. I was not even given a chance to pay my deductible because of their broken printer but I

2/8

31



I have since taken my vehicle to Don Hewlett collision center (Geico Approved and reputable) for them to review the work and look over my estimate. Out of the 11,000 dollars worth of parts that Georgetown Collision was paid out for they actually only replaced a hood, grille, windshield and bumper with very little associated hardware. There is more damage from them tearing into my truck than there was done to my truck in the accident. There is glass all over my truck. My radio no longer works, you will get pelted with glass if you use the AC and it looks as though every panel in my truck was pryed off with a Phillips screwdriver. Nothing was actually replaced inside the truck. Anyone that knows me and how I take care of my vehicles can tell you that this is not how it looked before i brought the truck to them.

+8

91                136 Comments 58 Shares

Like          Comment          Share

**John Tan** It looks like they were using the truck while they were supposed to fix it.

Like · Reply · 1w       5

Hide 11 Replies

**Jack Tanner Thibodeaux** John Tan yeah man the fact that they tried to cover up where it was and say someone had it that was fixing it is wild. Truck had almost 200 more miles on it when I picked it up.

Like · Reply · 1w       5

**Eric Carreno** Jack Tanner Thibodeaux now that's bullshit they put miles on your truck

Like · Reply · 1w       1

**John Tan** Jack Tanner Thibodeaux I hope Geico covers it and sues them .

Like · Reply · 1w

**Jack Tanner Thibodeaux** John Tan Geico hasn't been very helpful bro. I filed a new claim for vandalism.

Like · Reply · 1w       2

**John Tan** Jack Tanner Thibodeaux Damn, that's unfortunate. If you know a lawyer, you can ask them to draft of a letter of intent to pursue actions if they don't respond in a timely matter. They'll respond super quick

Like · Reply · 1w · Edited       4

**Eric Carreno** Jack Tanner Thibodeaux damn

Like · Reply · 1w

279

Suggested Pages

Like

Like

Friend Requests

Confirm   Delete

English (US) · Español · Português (Brasil) · Français (Fra Deutsch

Privacy · Terms · Advertising · Ac Cookies · More
Facebook © 2020

YOUR PAGES    9

CONTACTS

GROUP CONVERSATIONS

Create New Group

MORE CONTACTS (78)

Search

32



**Jack T**

★☆☆☆☆

05/15/2020

This place is fraudulent. I took my vehicle here for repair and after two months and having to report my vehicle stolen I received it back in terrible condition. This was originally a $5000 dollar estimate and due to obvious insurance fraud they turned it into an $18000 dollar repair. These guys had my truck for 58 days and only replaced A few things that were in the estimate but were paid $11000 dollars for parts. They damaged so much more in my truck and it's unsafe to drive. This has diminished the value of a truck that was in excellent condition. Please do not do business with this place.

< Q Georgetown Collision ➤

**Home** Services Photos Videos Posts Commu



**Georgetown Collision** ...
47 mins · ⚙

We got "blown up" on Facebook today by Jack Tanner Thibodaux.

https://www.facebook.com/jack.t.thibodeaux

I understand we cannot make everyone happy, but the lies people tell is what I never understand. If you are unhappy, I understand. If we failed to meet your expectations, then say so.

But why lie?

See attached photos. Geico estimate paying me for all aftermarket parts, but you will see invoices for all OEM, new parts at no expense to the customer who states:

"Out of the 11,000 dollars' worth of parts that Georgetown Collision was paid out for they actually only replaced a hood, grille, windshield and bumper with very little associated hardware."

Look at the attached invoices and you will see he how much integrity he has.

I do want to say this, he was upset mainly because we had a safety restraint issue that took a few weeks to resolve due to Covid 19 parts delays. He wanted to pick up his truck regardless and I said no. I was not going to put his family's life at risk in a vehicle with safety issues. That is what made him angry. He would have rather thrown caution to the wind and put his own safety and that of his family at risk, just to have his truck back quickly.



34


and put his own safety and that of his family at risk, just to have his truck back quickly.

I said no, and he is angry? So, blow me up on Facebook, but I did what was right and I used sound judgement and he is a child who just wanted his truck back regardless of any safety issues.

I find it interesting that he is going to a Geico approved shop to check our work. Had he taken it there in the first place he would have all the cheap, aftermarket parts that Geico paid for instead of the new, OEM parts that I put on his truck.

Look at the invoices and Geico paperwork attached. You will see A/M parts all over there estimate. That is Geico approved cheap parts and a Geico approved shop will use them!



Jack Tanner Thibodeaux (JT)

